GEORGE W. BRECKENRIDGE, JR., *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. CAMBRIDGE HOMES, INC., d/b/a Cambridge Properties, Defendant-Appellant and Cross-Appellee.

Second District   No. 2—92—1044

Opinion filed July 1, 1993.

Donald G. Mulack and Tracey E. Donner, both of Keck, Mahin & Cate, of Oakbrook Terrace, for appellant.

Joseph T. Morrison, of Morrison & Morrison, P.C., of Waukegan, for appellees.

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiffs, George and Tricia Breckenridge, filed the present lawsuit in the circuit court of Lake County against defendant, Cambridge Homes, Inc., for common-law fraud (count I), violations of section 2 of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1989, ch. 121½, par. 262) (count II), and breach of implied warranty of habitability (count III) in the context of the plaintiffs' purchase of a new residence from the defendant in December 1989. The case went to a jury trial, and a verdict was entered in favor of the plaintiffs on the breach of implied warranty count and against the plaintiffs on the common-law fraud count. The consumer fraud count was tried without a jury, and the court entered a judgment against the plaintiffs. On appeal, defendant asserts that (1) the plaintiffs waived their right to pursue a claim for breach of the implied warranty of habitability when they signed and initialed the contract provision containing a disclaimer of the implied warranty of habitability and therefore the trial court erred in failing to grant defendant's motion for directed verdict on count III, and (2) the trial court erred in denying defendant's post-trial motions for directed verdict and judgment notwithstanding the verdict on count III. On cross-appeal, the plaintiffs assert that the trial court erred in applying the elements of common-law fraud to the consumer fraud count, and that the finding of the trial court on that count was against the manifest weight of the evidence. We affirm in part and reverse in part.

In September 1989, the plaintiffs, George and Tricia Breckenridge, decided to purchase a new home from the defendant, Cambridge Homes, Inc. (Cambridge). George Breckenridge was a regional sales manager for several Japanese corporations, and his wife, Tricia, had been a chief lobbyist for the telecommunications industry as well as having owned two companies in the past. Plaintiffs had stopped and looked at model homes in the new Mill Creek Crossing subdivision in Gurnee being developed by the defendant. Plaintiffs were shown models by a salesman for the defendant named John Horowitz. On September 10, 1989, the plaintiffs viewed a home being built on lot 44 which was 70% to 75% completed. The plaintiffs decided to purchase this residence and gave the salesman a deposit of $1,000.

On September 17, 1989, John Horowitz prepared a standard home purchase agreement. Plaintiffs were asked to sign the contract and place their initials next to the bold-type language in paragraph 15, which was entitled "Limited Warranty." Plaintiffs each testified that they read the bold-type language of the contract, although neither

plaintiff read the entire contract before initialing and signing. The bold type of the contract constituted about half of the "Limited Warranty" paragraph and most of the "Entire Agreement" paragraph, which was paragraph 19. The "Limited Warranty" paragraph contained the following language in bold type:

"15. LIMITED WARRANTY: *** NO WARRANTY, GUARANTEE, OR UNDER-TAKING WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE HOUSE AND CONSTRUCTION THEREOF, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN THE HOW WARRANTY, SHALL BIND OR OBLIGATE THE SELLER. ALL OTHER WARRANTIES, GUARANTEES AND UNDERTAKINGS ARE HEREBY EXPRESSLY DISCLAIMED. Specifically, but without limiting the generality of the fore-going, SELLER HEREBY EXPRESSLY DISCLAIMS THE IMPLIED WARRANTY OF HABITABILITY CREATED BY THE ILLINOIS CASE OF *PETERSEN v. HUBSCHMAN CONSTRUCTION COMPANY, INC.,* AND ANY OTHER STATUTORY OR COMMON LAW IMPLIED WARRANTY OF HABITABILITY. THE CONSEQUENCE OF SUCH DISCLAIMER BY SELLER IS THAT SELLER'S SOLE AND EXCLUSIVE WARRANTY GIVEN TO PURCHASER IN CONNECTION WITH THIS AGREEMENT IS THE HOW WARRANTY. PURCHASER'S INITIALS ADJACENT TO THIS PARAGRAPH ARE INTENDED AS AND SHALL BE EVIDENCE OF PURCHASER'S ACKNOWLEDGEMENT OF SELLER'S DISCLAIMER OF SUCH IMPLIED WARRANTY OF HABITABILITY AND OF PURCHASER'S ACCEPTANCE OF THE HOW WARRANTY AS THE SOLE AND EXCLUSIVE WARRANTY OFFERED BY SELLER IN CONNECTION WITH THE SALE OF THE HOUSE."

The "Entire Agreement" paragraph read as follows:

"19. ENTIRE AGREEMENT. This agreement and the matters expressly referred to herein constitute the entire Agreement between the Seller and Purchaser. NO REPRESENTATIONS, WARRANTIES, UNDERTAKINGS OR PROMISES, WHETHER ORAL, IMPLIED OR OTHERWISE, CAN BE MADE OR HAVE BEEN MADE BY EITHER SELLER, ITS AGENTS OR BROKERS, OR PURCHASER TO THE OTHER UNLESS EXPRESSLY STATED HEREIN OR UNLESS MUTUALLY AGREED TO IN WRITING BETWEEN SELLER AND PURCHASER. ALL AMENDMENTS, SUPPLEMENTS,

OR RIDERS HERETO, IF ANY, SHALL BE IN WRITING EXECUTED BY BOTH PARTIES AND ATTACHED TO THIS AGREEMENT."

Plaintiffs then placed their initials in the margin next to the disclaimer language indicating that they read the language and were accepting the HOW warranty. In addition, the "Limited Warranty" paragraph also contained the following language in small type: "Seller has delivered to Purchaser a booklet containing specimen copies of the insurance/warranty documents for the HOW Warranty and Purchaser hereby acknowledges receipt thereof and acceptance of the terms of said HOW Warranty." At trial, Tricia Breckenridge testified that the defendant's salesman, John Horowitz, told plaintiffs "not to worry *** because the HOW warranty that [they] would get with the house would cover all defects or problems that [they] discovered in [their] house." The plaintiffs also put down an additional $9,000 in earnest money at the time they signed the purchase agreement.

At trial, the defendant admitted that it has a policy of providing a specimen HOW warranty to prospective purchasers at the time of signing of the home purchase agreement. In this case, the defendant's salesman did not provide the plaintiffs with the specimen HOW warranty before the purchase agreement was executed. In addition, there was no evidence presented at trial that indicated that the plaintiffs requested a copy of the HOW warranty before signing the contract.

Although the defendant had the home scheduled for completion in mid-January 1990, the defendant agreed to accelerate the completion date on a rush basis to sometime in December 1989 at the plaintiffs' request. A closing date was set for December 15, 1989.

Prior to closing, defendant has a policy of performing a procedure known as a "pre-walk inspection." This inspection is done by the defendant's service department one week prior to closing to see what needs to be done to get the house ready for closing. On December 8, 1989, Bruce Wilde, an employee of the defendant's service department, examined the residence. However, Mr. Wilde did not conduct a typical prewalk inspection because the house was still being worked on.

On December 15, 1989, the home was not completed and ready for delivery to plaintiffs. Plaintiffs were given the option to close one week later to allow defendant to complete the house. Plaintiffs, against the advice of their attorney, decided to close on December 15, 1989, and take delivery subject to the unfinished work on the house. Their decision was based on the fact that they had movers scheduled

to bring their belongings to the home that day. On the afternoon of December 15, 1989, plaintiffs paid $367,370 for the property.

Due to delays caused by the holidays and plaintiffs' travel schedules, it was not until January 27, 1990, that defendant's employees were invited to the home to review a "punch list" prepared by plaintiffs of 198 finish items which plaintiffs wanted corrected. Representatives of the defendant spent three consecutive days in March 1990 at the plaintiffs' home making repairs and addressing the items on the plaintiffs' punch list. Following this work, defendant sent a new sales representative, Stephen Norris, to the plaintiffs' house. After going through the punch list, plaintiffs and Norris agreed that only 37 items at that point were fixed properly. Between March 26, 1990, and early May 1990 defendant worked to finish certain repairs. On May 3, 1990, the plaintiffs filed the present lawsuit charging defendant with fraud and breach of implied warranty and thereafter refused to let defendant into their home to conduct any repairs. The evidence at trial revealed that the alleged defects included: windows which leaked, nail pops on multiple walls, water stains indicating a leaking roof on rafters in the attic, and random cracks in the basement floor, among others.

Count I of the complaint alleged common-law fraud; count II charged violation of the Consumer Fraud and Deceptive Business Practices Act; and count III alleged a breach of the implied warranty of habitability. Defendant filed its answer and counterclaim for defamation and interference with contract. On November 27, 1990, the trial court ordered the claim for damages for breach of implied warranty of habitability stayed pending arbitration by a neutral third-party dispute settler as required by the HOW warranty. On April 26, 1991, the arbitration was conducted at plaintiffs' home. To that end, an impartial arbitrator, Gerald Hillman, was appointed by the National Academy of Conciliators to review, in the presence of the parties, plaintiffs' punch list items. He decided whether the work performed by the defendant was within industry standards. Defendant agreed during that arbitration to complete the work on 34 items which it had earlier agreed to perform, and the arbitrator found that additional work was required on 53 other items.

As per the terms of the HOW warranty, in May 1991, the defendant accepted the decision of the arbitrator and agreed to perform all warranty work recommended by him. Plaintiffs refused to accept the decision of the arbitrator and refused to allow the defendant to fix the items recommended, as well as refusing to accept money in lieu of the repairs which was an option under the HOW warranty.

On August 21, 1991, plaintiffs filed a first amended complaint which repleaded count I, alleging common-law fraud. On April 28, 1992, plaintiffs filed a second amended complaint. On June 15, 1992, a jury was selected and the trial commenced. Eight witnesses were called by the plaintiffs, and eight additional witnesses were called by the defendant. Testimony at trial by plaintiffs' witnesses indicated the repair of these items would involve major amounts of work. The testimony of plaintiffs' witnesses and defendant's witnesses was conflicting as to the cost of repairs and whether certain items should be repaired. However, no one disputed that the house was at least habitable in that the plaintiffs could live in it and it was not unsafe. Five witnesses were called on defendant's counterclaim. On June 22, 1992, the jury returned a verdict in favor of the defendant on the common-law fraud count and in favor of the plaintiffs on the breach of implied warranty of habitability count. Judgment was entered for damages for plaintiffs in the amount of $58,519 on that verdict. Based on the same evidence, the court sitting without a jury found in favor of defendant on the Consumer Fraud and Deceptive Business Practices Act claim. The jury also returned a verdict in favor of the plaintiffs on defendant's counterclaim.

Defendant filed a post-trial motion for a directed verdict and for judgment notwithstanding the verdict on the basis of all the evidence presented on the breach of implied warranty of habitability count pursuant to section 2—1202 of the Civil Practice Law (Ill. Rev. Stat. 1989, ch. 110, par. 2—1202). Plaintiffs filed a post-trial motion requesting the trial court to reconsider its decision on the consumer fraud count. Both motions were denied. On August 28, 1992, defendant filed its timely notice of appeal related to count III only, and on September 4, 1992, plaintiffs filed their notice of cross-appeal.

The first issue on appeal is whether the trial court erred in failing to grant defendant's motion for directed verdict on the breach of implied warranty of habitability count. The standard for a directed verdict was put forth in the seminal case of *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510 ("verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand"). In that case, the court was called upon to resolve conflicting testimony as to whether railroad crossing lights were working as testified to by several different witnesses. Notwithstanding the conflict in testimony, the supreme court concluded that the presence of conflicting testimony does not necessarily preclude

the entry of a directed verdict. The court indicated that it must be a factual dispute of "some substance" to prevent a directed verdict. *Pedrick*, 37 Ill. 2d at 505.

In the present case, the plaintiffs brought suit for breach of implied warranty of habitability. The defendant raised the affirmative defense that the plaintiffs knowingly waived their right to sue for breach of the implied warranty of habitability by signing the agreement and initialling the purchase agreement provisions in the margin. On appeal, the defendant contends that by so signing and initialling, the plaintiffs accepted the express HOW warranty in lieu of the implied warranty of habitability. The defendant argues that the trial court erred, as a matter of law, by failing to grant the defendant's motion for directed verdict on the breach of implied warranty of habitability count. On the other hand, the plaintiffs contend that there was no voluntary and intentional waiver of the implied warranty of habitability because the plaintiffs signed the contract under a misrepresentation of material facts. Specifically, the plaintiffs argue that material facts were misrepresented to them since (1) they were not given a copy of the HOW warranty prior to signing the contract, and (2) John Horowitz made an alleged misrepresentation that the HOW warranty would cover all defects and problems in the house to induce them to sign the contract.

■ Our supreme court recognized the existence of an implied warranty of habitability which permits a purchaser to recover from the builder-seller for latent defects in a newly constructed home in *Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31. The court also determined that a disclaimer provision could be given effect. To do so, the court determined that the disclaimer must be a conspicuous provision which fully discloses the consequences of its inclusion and that the agreement of the parties in fact included the disclaimer. (*Petersen*, 76 Ill. 2d at 43; *Country Squire Homeowners Association v. Crest Hill Development Corp.* (1986), 150 Ill. App. 3d 30.) Such a disclaimer must be strictly construed against the builder-vendor. (*Petersen*, 76 Ill. 2d at 43.) A waiver has been defined as the "intentional relinquishment of a known right." (*Schuster v. East St. Louis Jockey Club, Inc.* (1976), 37 Ill. App. 3d 483, 487.) Waiver is not established where consent was given under a mistake or misapprehension of fact. (*Hamilton v. Williams* (1991), 214 Ill. App. 3d 230, 241.) Since the defendant is claiming waiver, it had the burden of proving at trial that the plaintiffs knew of their right to an implied warranty of habitability and that the plaintiffs knowingly waived that right. *Ryder v. Bank of Hickory Hills* (1991), 146 Ill. 2d 98, 105.

In the present case, the evidence showed that the plaintiffs are intelligent and experienced business people. We note that the plaintiffs testified that they read the portion of the "Limited Warranty" paragraph that stated that the seller expressly disclaimed the implied warranty of habitability and that the consequence of that disclaimer by the seller is that the seller's sole warranty given to purchaser in connection with the agreement is the HOW warranty. Furthermore, the bold language asserted that "PURCHASER'S INITIALS ADJACENT TO THIS PARAGRAPH ARE INTENDED AS AND SHALL BE EVIDENCE OF PURCHASER'S ACKNOWLEDGEMENT OF SELLER'S DISCLAIMER OF SUCH IMPLIED WARRANTY OF HABITABILITY." Such language was conspicuous, and the plaintiffs initialed the paragraph indicating that they had accepted the terms of the paragraph.

In addition, John Horowitz told the plaintiffs when they initialed the contract that their initials indicated that they understood that all other warranties other than the HOW warranty were disclaimed. The following colloquy occurred during George Breckenridge's testimony:

"Q. Now, you recall that John asked you to put your initials in that column which would indicate that you read the language of that paragraph, isn't that correct?

A. [George Breckenridge] Yes, that is correct.

Q. And you knew what you were doing at the time that you put your initials there, isn't that so?

A. [George Breckenridge] Yes, I did."

The following colloquy occurred during Tricia Breckenridge's testimony:

"Q. Now, looking at the original exhibit that you have on the rear side, John asked you to put your initials next to that language, did he not?

A. [Tricia Breckenridge] He told us we had to put them there.

\* \* \*

Q. Thank you, ma'am. Now, John told you that those initials were a disclaimer of the warranties other than a HOW Warranty, isn't that correct?

A. [Tricia Breckenridge] Correct."

The evidence thus showed that the disclaimer language was brought to their attention, that the consequences of agreement were made known to them, and that they knowingly waived their rights to pursue an action against defendant for any alleged breach of the implied warranty of habitability. Thus, it is evident that under *Petersen* an ef-

fective disclaimer of the implied warranty of habitability occurred when the plaintiffs entered into the purchase agreement. *Petersen*, 76 Ill. 2d at 43.

▪ We note the plaintiffs' argument that they were in misapprehension of the material facts of the HOW warranty because the defendant did not give them a copy of the HOW warranty prior to executing the purchase agreement. The failure to read a document before signing it is normally no excuse for a party who signs it. (*State Bank v. Sorenson* (1988), 167 Ill. App. 3d 674, 681.) A party who has had an opportunity to read a contract before signing, but signs before reading, cannot later plead lack of understanding. (*Sorenson*, 167 Ill. App. 3d at 681.) In *Sorenson*, the defendant sought to avoid her responsibility to pay off a note to a bank from which she had taken a loan. She argued that she had not known the terms of the transaction when she entered into it. The court found that such unawareness was inexcusable. (*Sorenson*, 167 Ill. App. 3d at 681.) The court observed that the face of the note provided numerically and in written form how much money she had to pay the bank. Furthermore, the defendant's signature appeared directly below the terms on the document. Thus, the court concluded, if the defendant did not know the terms of the note, it was because she did not read the terms on the face of the note. *Sorenson*, 167 Ill. App. 3d at 681.

In the present case, the "Limited Warranty" paragraph itself stated that the seller had delivered to the purchaser a specimen copy of the HOW warranty and that the purchaser thereby acknowledged receipt thereof and accepted the terms of the HOW warranty. We note that there is no evidence in the record that the plaintiffs asked for the specimen copy of the HOW warranty. The small print in the "Limited Warranty" paragraph incorporated by reference the terms of the HOW warranty. The plaintiffs could have requested the specimen copy of the HOW warranty after reading the "Limited Warranty" paragraph that stated that the HOW warranty was the exclusive warranty offered by the seller in connection with the sale of the house. They did not do that. By signing the agreement, initialing the agreement, and discussing the consequences of the placement of their initials at that paragraph, the plaintiffs accepted the terms of said HOW warranty. Thus, plaintiffs cannot now claim that they were under a misapprehension about the HOW warranty.

We also note plaintiffs' argument that John Horowitz made a misrepresentation that the HOW warranty would "cover all defects or problems that [they] discovered in [their] house." To demonstrate that Horowitz' statement was true, the defendant presented the testimony

of the arbitrator, who made a recommendation as to which of the plaintiffs' punch list items where covered by the HOW warranty. The arbitrator, Hillman, testified that he reviewed every item on plaintiffs' punch list and applied the industry standard adhered to by the HOW warranty to each item. He reported that every complaint on the punch list was covered by the warranty in some fashion. However, Hillman testified, just because an item is covered by the warranty does not mean that the defendant need repair or replace it. Only those that do not meet the industry standard adhered to by the HOW warranty are supposed to be repaired by the defendant. Therefore, Hillman decided that 87 out of plaintiffs' punch list of 198 items were in need of repair, although one may infer from his testimony that all 198 were covered by the HOW warranty. Thus, the evidence supported the statement that any unfinished item or problem which may arise in the plaintiffs' home was covered by defendant under the HOW warranty. Had plaintiffs requested to see the HOW warranty before signing the agreement, they could have read the terms of the warranty and ascertained that an industry standard was to be applied. That could have alerted them to the fact that their own standards for the condition of the home would not be considered in the application of the HOW warranty. In conclusion, plaintiffs did not introduce evidence that Horowitz' statement was false.

Plaintiffs did introduce testimony from experts as to the condition of different items in their home such as the condition of nail pops on the dry wall in the home, the condition of shingles on the roof, the condition of the basement floor, and the cost of repairing these items. This testimony also conflicted with some of defendant's witnesses' testimony as to the cost of repairs, the number of repairs necessary, and whether certain items needed repair. None of this testimony conflicted with Hillman's statements that all the items on the punch list were covered by the HOW warranty. Thus, the evidence material to the issue of the falsity of Horowitz' statement was not in conflict.

Defendant contends that the circumstances surrounding this disclaimer of the right to sue for implied warranty of habitability are analogous to the circumstances surrounding such a disclaimer in *Country Squire*. Plaintiffs distinguish *Country Squire* on the basis that the circumstances were different in that case from the present case: in that case, (1) there was no policy by the vendor to provide a copy of the HOW warranty to the buyers before the execution of the sales agreement, and (2) there was no misrepresentation by the vendor's agent. In *Country Squire*, the court found, as a matter of law, that the disclaimer was a bar to the cause of action for breach of im-

plied warranty of habitability. The plaintiff in that case argued that the trial court did not grant a motion for summary judgment or directed verdict on the basis that the disclaimer did not use the phrase "warranty of habitability" but used the phrase the "implied warranties of merchantability and fitness." However the appellate court found the disclaimer to be in a conspicuous location, in large-size print, and in plain language, and thus was an agreement between the parties, satisfying the standard set out by *Petersen*. *Country Squire*, 150 Ill. App. 3d at 32.

■ Likewise, we determine that under the circumstances existing in the present case, the disclaimer is effective and bars the cause of action for breach of implied warranty of habitability. To address plaintiffs' contentions about *Country Squire*, we do not believe that defendant should be penalized for having a policy of providing the HOW warranty prior to the execution of the sales agreement and not following through on it. If plaintiffs had read the contract that they were signing, they would have known that the HOW warranty was incorporated by reference, and they did have the opportunity to ask to see a copy of its terms. Furthermore, we determine that the evidence discussed above shows that Horowitz' statement was not false. Thus, in light of the circumstances surrounding the signing of the purchase agreement, we have viewed the evidence regarding whether plaintiffs knowingly waived their right to sue for breach of implied warranty of habitability in its aspect most favorable to the plaintiffs. In doing so, we determine that the evidence so overwhelmingly favors the movant that no contrary verdict based on the evidence could stand. Thus, the trial court erred in not awarding a directed verdict to defendant pursuant to section 2–1202 of the Civil Practice Law. The disposition of the trial court on the issue of defendant's alleged breach of implied warranty of habitability is reversed.

In light of our determination that the evidence showed that Horowitz' statement was not false, we determine it is unnecessary for us to address plaintiffs' argument that Cambridge is estopped from claiming the plaintiffs waived the implied warranty of habitability, since one of the elements of estoppel is misrepresentation and that element is not present in the facts of this case. (*Vaughn v. Speaker* (1988), 126 Ill. 2d 150, 162.) Furthermore, in light of our determination that the trial court erred in not directing the verdict for defendant, we need not address the issue whether it should have granted a judgment notwithstanding the verdict for defendant.

In their cross-appeal, plaintiffs contend that the trial court erred in applying the elements of common-law fraud to the consumer fraud

count. Furthermore, plaintiffs contend that the finding of the trial court on the consumer fraud count was against the manifest weight of the evidence, that this court should reverse the trial court's ruling on that count, and that the cause should be remanded to the trial court to determine damages on the consumer fraud count. The defendant argues that the trial court did not apply the wrong standard to the consumer fraud count, and even if it did apply the wrong standard, its decision should be sustained as its decision was not against the manifest weight of the evidence.

A claim for consumer fraud comes under the Consumer Fraud and Deceptive Business Practices Act (Act) (Ill. Rev. Stat. 1989, ch. 121½, par. 261 *et seq.*). Under section 2 of the Act, the plaintiff must show: (1) a deceptive act or practice; (2) an intent by the defendant that plaintiff rely on the act or practice; and (3) the deception occurred in the course of conduct involving trade or commerce. (Ill. Rev. Stat. 1989, ch. 121½, par. 262; *Hoke v. Beck* (1992), 224 Ill. App. 3d 674, 679.) The "intent" required by the Act is merely the defendant's intent that the plaintiff in the action rely on the act that defendant performed, or information defendant gave to plaintiff, as opposed to any intent on the defendant's part to deceive. (*Hoke*, 224 Ill. App. 3d at 679; *Carl Sandburg Village Condominium Association No. 1 v. First Condominium Development Co.* (1990), 197 Ill. App. 3d 948, 953.) The Act should be liberally construed to effect its purposes. (*Hoke*, 224 Ill. App. 3d at 679.) Plaintiff's complaint under the Act need not prove a pattern or practice of deceptive acts; a single deceptive act is sufficient to support recovery under the Act. (*Rubin v. Marshall Field & Co.* (1992), 232 Ill. App. 3d 522, 532.) The legislature intended claims under the Act to be heard by a judge sitting without a jury. (*Richard/Allen/Winter, Ltd. v. Waldorf* (1987), 156 Ill. App. 3d 717, 724-25.) A reviewing court will not disturb a trial court's finding unless the holding of the trial court is manifestly erroneous. *Century 21 Castles by King, Ltd. v. First National Bank* (1988), 170 Ill. App. 3d 544, 549.

On June 23, 1992, the trial court ruled on count II. We have reviewed the record and determine that the trial court erroneously applied an element of common-law fraud to the consumer fraud analysis. The pertinent statement by the trial court follows:

"[A]s a result of what I just said, the facts must support a claim that is brought under 121½ and it directed me to Maguire versus Holcomb in that regard, 169 Ill. App. 3d, 238. You may also look at 150 Ill. App. 3d, 597, and 139 [Ill.] App. 3d, 172. And the cause of action under 121½ must be as to a mate-

rial fact; okay? And to be under the scope of this Act you must have an intentional misrepresentation, or misrepresentations to a prospective buyer; and, second, the seller must have knowledge of the false, misleading, or deceptive nature of the information conveyed."

In that colloquy, the court discussed a claim brought under the consumer fraud statute (Ill. Rev. Stat. 1989, ch. 121½, par. 262), and it cited some of the cases in which that statute is applied. Then it went on to discuss the elements of consumer fraud and properly stated that the fact must be a material fact and that there must be an intentional misrepresentation or merely a misrepresentation. Then the court erroneously stated that the defendant must have knowledge of the deceptive nature of the information. This is not an element of consumer fraud and is an element of common-law fraud, since to prevail on a common-law fraud claim, the plaintiff must show the defendant intentionally made a false statement. (*Zimmerman v. Northfield Real Estate, Inc.* (1986), 156 Ill. App. 3d 154, 161.) Thus, the trial court utilized an improper standard in deciding the consumer fraud count.

This error by the trial court, nevertheless, is harmless error, as we determine that the result reached by the court was proper, since no deceptive act or practice existed on these facts. Plaintiffs argue that there are several examples of misrepresentations of facts by the defendant which qualify as deceptive acts under the Act. For instance, plaintiffs were told the home would be built with "expert workmanship" and "custom quality"; the home would have a quality similar to the models plaintiffs saw; plaintiffs were told that the defendant expected a "perfect" home to be delivered to plaintiffs; and the condition of the residence would be "perfect" upon delivery. We determine that such statements are to be reasonably construed as "puffing" and do not violate even the broad scope of the Act. See *Zimmerman*, 156 Ill. App. 3d at 163 (where multiple listing descriptions of a house as "magnificent" and "comfortable" do not qualify as fraudulent misrepresentations); *Spiegel v. Sharp Electronics Corp.* (1984), 125 Ill. App. 3d 897, 902 (where distributor's statements that photocopier would make "picture perfect copies" and would "reduce error and paper waste" did not qualify as fraudulent misrepresentations).

Plaintiffs further argue that (1) the fact that they were not given a copy of the HOW warranty before the signing of the purchase agreement, (2) the fact that the prewalk inspection did not take place and they were not informed of this, and (3) the alleged misrepresentation by Horowitz are all examples of misrepresentations of fact. As

discussed above, we believe that plaintiffs cannot enter into a written agreement which incorporated the HOW warranty by reference, not read the agreement they entered into, and now prevail on the fact that the defendant did not provide them with a copy of the HOW warranty. Furthermore, the plaintiffs do not make the argument or present evidence to support the fact that the execution of the prewalk inspection was material to their decision on whether to go through with the closing on the house. Lastly, we determined in the issue addressed above that the statement made by Horowitz was not a misrepresentation. Thus, we determine that no deceptive act took place. Thus, since one of the elements of consumer fraud is not present on these facts, we determine that the trial court's ruling was not against the manifest weight of the evidence, and we sustain the trial court's decision in favor of the defendant on the consumer fraud count.

The decision of the circuit court of Lake County is affirmed in part and reversed in part.

Affirmed in part; reversed in part.

INGLIS, P.J., and UNVERZAGT, J., concur.