DAVID J. KLECZEK *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. ROBERT JORGENSEN, JR., *et al.*, Defendants-Appellants and Cross-Appellees.

Fourth District No. 4—01—0295

Argued January 23, 2002.—Opinion filed April 10, 2002.

1014

Gordon W. Gates (argued), of Gates, Wise & Schlosser, P.C., of Springfield, for appellants.

Brett K. Gorman (argued) and Melinda S. Madison, both of Schmiedeskamp, Robertson, Neu & Mitchell, of Quincy, for appellees.

JUSTICE APPLETON delivered the opinion of the court:

Plaintiffs, David J. and Patricia F. Kleczek, sued defendants, Robert Jorgensen, Jr., and Anne Marie Jorgensen, for allegedly inducing them, through fraudulent misrepresentations, to buy a house and for breaching express and implied warranties. After a bench trial, the trial court entered a judgment in plaintiffs' favor on their claims of common-law fraud, statutory fraud under the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 through 12 (West 1996)), and breach of the implied warranty of habitability. The court also declared a rescission of the contract and ordered defendants to refund the purchase price. The court granted plaintiffs' prayer for attorney fees under the Consumer Fraud Act but denied their prayer for punitive damages and their motion for prejudgment interest.

Afterward, some third parties offered to buy the house from plaintiffs. Defendants had not yet refunded the purchase price. The trial court granted plaintiffs' petition to modify the judgment to allow them to sell the house, but refused to modify the judgment to award them money damages equal to the difference between the rescission amount and the sale price. To recover those money damages, the trial court said, plaintiffs would have to amend their complaint and present evidence in a new trial. Plaintiffs never did so.

Defendants appealed, arguing the trial court erred by (1) entering a judgment against them under the Consumer Fraud Act and (2) awarding plaintiffs their attorney fees. They do not challenge the trial court's finding of a breach of the implied warranty of habitability. Plaintiffs cross-appealed, arguing that the trial court erred in (1) denying punitive damages, (2) denying prejudgment interest, and (3) refusing to modify the judgment so as to award them the difference between the rescission amount and the sale price. We affirm in part, vacate in part, and remand for further proceedings.

## I. BACKGROUND

In July 1994, defendant Robert Jorgensen (Jorgensen) and his wife, defendant Anne Marie Jorgensen (Anne Marie), purchased a 42-

acre parcel of real estate in Pike County, Illinois. Defendants had been in the business of building new houses under the name "Jorgensen Homes." They subdivided the parcel into nine lots and called the subdivision "Deer Run Estates," intending to make it a housing development. In an effort to lure buyers for the lots and houses, Jorgensen placed a "For Sale" sign near the entrance of the subdivision.

In August 1995, Jorgensen began building a house on lot number 2 (Deer Run No. 2). According to Jorgensen, when construction of Deer Run No. 2 began, he and his wife intended to make the house their primary residence. Jorgensen installed much of the plumbing himself, although he had no plumbing license. On May 7, 1996, two plumbing inspectors from the Illinois Department of Public Health (Department), Robert Schafer (Schafer) and John Popov, came to Deer Run No. 2, looked at the plumbing, verbally identified for Jorgensen some of the plumbing defects, and told him that if he were building the house for sale, a licensed plumber would have to install the rest of the plumbing. At this time they gave him nothing in writing.

Plaintiff David Kleczek visited Deer Run Estates on May 15, 1996. He met with Jorgensen at Deer Run No. 2 and asked him if the house were for sale. (Construction of the house was almost complete.) Jorgensen said yes and, according to Kleczek, gave him a "spec sheet" outlining the house's features. Jorgensen denied giving the "spec sheet" to Kleczek and testified that the "spec sheet" had been created for an open house that defendants held or intended to hold at Deer Run No. 2 in March 1996. The "spec sheet" said that the house had a "1[-][y]ear [w]orkmanship [g]uarantee."

On May 22, 1996, plaintiffs and defendants signed a contract, whereby plaintiffs agreed to buy Deer Run No. 2 from defendants. The contract was a form document that Anne Marie had obtained, and it stated:

> "[P]rior to the execution of this instrument[,] neither [seller] nor [seller's] agent has received any notice issued by any city, village[,] or other government authority of a dwelling code violation in the dwelling structure upon the premises herein described."

Prior to the execution of the contract, defendants never told plaintiffs of the plumbing inspectors' visit. According to Jorgensen, he first mentioned the inspectors' visit on June 15, 1996, when he told Patricia Kleczek that the plumbing inspectors had been to the house and that as a consequence some of the plumbing needed to be changed. Patricia Kleczek testified, however, that she was unaware that the Department had "been involved" until April 29, 1997, several months after the closing, when Schafer reinspected the plumbing at plaintiffs' request.

On June 27, 1996, Jorgensen received a certified letter from the Department memorializing the inspectors' visit of May 5, 1996, and providing a detailed list of the repairs that needed to be made. He did not disclose this letter to the Kleczeks. Instead, he hired a licensed plumber, who, according to Jorgensen, installed the rest of the plumbing and corrected all of the defects that the Department listed in its June 27 letter. The closing occurred on July 26, 1996, for a total purchase price of $182,300.

Over the next several months, the plumbing sprang some minor leaks and then some major leaks, causing water damage to the interior of the house. Plaintiffs discovered that one of the toilets was fed by a hot-water line instead of a cold-water line, and they testified that a strong odor of sewage emanated from the basement. They also noticed cracks in interior walls. They told Jorgensen of these defects (except for the cracks in the walls) and demanded that he repair them in accordance with his "1[-][y]ear [w]orkmanship [g]uarantee." Initially. Jorgensen made some repairs, but in February 1997 he refused to make any more repairs.

In April 1997, plaintiffs asked the Department to inspect the plumbing. Schafer returned to Deer Run No. 2 and informed plaintiffs that he had been there before and had notified Jorgensen of plumbing defects. Schafer found that many of the plumbing defects that he noted earlier had been corrected, but he found additional plumbing defects. After the reinspection, plaintiffs hired a plumber to correct the defects.

On July 25, 1997, plaintiffs filed an initial complaint against defendants for breach of contract. Plaintiffs amended their complaint several times. The parties completed discovery on a fifth-amended complaint, which alleged the following: (1) breach of the implied warranty of habitability, (2) violation of the Consumer Fraud Act, (3) common-law fraud, and (4) breach of express warranty. In their prayer for relief, plaintiffs requested rescission of the contract to purchase Deer Run No. 2, assessment of attorney fees and costs, and punitive damages under the Consumer Fraud Act.

On January 18, 2000, after a bench trial, the trial court entered a partial judgment in plaintiffs' favor on the breach of the implied warranty of habitability, the Consumer Fraud Act, and common-law fraud. Specifically, the court found that defendants had violated the Consumer Fraud Act by (1) falsely representing that they had received no notice of any violations of the plumbing code and (2) making a warranty and then disavowing it. The court granted rescission of the purchase contract, ordering plaintiffs, within 30 days, to quitclaim Deer Run No. 2 back to defendants in exchange for $182,300 and

entering a money judgment in favor of plaintiffs in the amount of $4,216.11 for plumbing repairs. The court afterward denied punitive damages and prejudgment interest but awarded plaintiffs $38,896.05 in attorney fees and costs.

The order of rescission was never implemented. On July 24, 2000, Dan and Anita Mefford (Meffords) offered to buy Deer Run No. 2 from plaintiffs. Plaintiffs petitioned the court for a modification of the judgment to allow them to sell the house to the Meffords for $135,000 and for an award of the difference between the rescission amount, $182,300, and the sale price, $135,000. Defendants had no objection to the proposed sale.

The trial court granted plaintiffs' petition to modify the judgment so as to allow the sale but denied their request to summarily award them the difference between the rescission amount and the sale price. Instead, the trial court allowed plaintiffs, if they wished, to file a sixth-amended complaint by a certain date and to "reopen [the] evidence." Plaintiffs closed the sale of the property to the Meffords but never filed a sixth-amended complaint. Accordingly, the trial court entered its final judgment on March 8, 2001, incorporating the terms of its previous dispositive orders.

In summary, the trial court found in favor of plaintiffs on count I (breach of the implied warranty of habitability), count II (violation of the Consumer Fraud Act), and count III (common-law fraud) of the fifth-amended complaint. The court awarded plaintiffs $4,216.11 for plumbing repairs and $38,896.05 in "fees and litigation expenses" but denied punitive damages and prejudgment interest.

This appeal and cross-appeal followed.

## II. ANALYSIS

### A. Consumer Fraud Act

Essentially, defendants make two arguments against the judgment on count II of the fifth-amended complaint (the count alleging violations of the Consumer Fraud Act): (1) the Consumer Fraud Act does not apply to their sale of Deer Run No. 2 to plaintiffs; and (2) they did not violate the Consumer Fraud Act.

### 1. *Does the Consumer Fraud Act Apply to the Sale of Deer Run No. 2?*

■ In attempting to take the sale outside the scope of the Consumer Fraud Act, defendants rely on two sets of authorities. The first is the statute itself, specifically section 10b(4) (815 ILCS 505/10b(4) (West 1996)), which defendants quote as follows: "Nothing in this Act shall apply to *** the communication of any false misleading

or deceptive information provided by the seller of real estate located in Illinois ***." That is not what subparagraph (4) says, however. By leaving out a comma and a clause, defendants have distorted the meaning. Subparagraph (4) actually says:

"Nothing in this Act shall apply to ***

* * *

(4) [t]he communication of any false, misleading[,] or deceptive information, provided by the seller of real estate located in Illinois, *by a real estate salesman or broker licensed under 'The Real Estate Brokers License Act* [(Ill. Rev. Stat. 1981, ch. 111, pars. 5701 through 5743 (repealed) (now 225 ILCS 454/1—5 through 999—99 (West 2000)))],' unless the salesman or broker knows of the false, misleading[,] or deceptive character of such information. This provision shall be effective as to any communication, whenever occurring." (Emphasis added.) 815 ILCS 505/10b(4) (West 1996).

When read as written (punctuation, clauses, and all), the statute refers only to a "communication" by a licensed "salesman" or "broker." Section 10b(4) applies only to innocent misrepresentations by a real-estate professional to a prospective buyer, when the only person who knows of the falsity is the seller, who gave the information to the real-estate professional.

Defendants cite *Strauss v. Cruz*, 259 Ill. App. 3d 608, 609-10, 631 N.E.2d 468, 469 (1994), for the proposition that section 10b(4) exempts all false, misleading, or deceptive communications by any seller of Illinois real estate. Although we agree with the result in *Strauss*, we do not agree with its interpretation of section 10b(4). See *Scarsdale Builders, Inc. v. Ryland Group, Inc.*, 911 F. Supp. 337, 339 n.6 (N.D. Ill. 1996). In *Strauss*, the court effectively splits the exception in subparagraph (4) into two exceptions: one for communications made in connection with the sale of real estate and the other for communications by a real estate professional. *Strauss*, 259 Ill. App. 3d at 609-10, 631 N.E.2d at 469. We interpret the statute *de novo. Yang v. City of Chicago*, 195 Ill. 2d 96, 103, 745 N.E.2d 541, 545 (2001). When giving section 10b(4) its plain and ordinary meaning and considering all of its parts (see *Paris v. Feder*, 179 Ill. 2d 173, 177, 688 N.E.2d 137, 139 (1997); *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189, 561 N.E.2d 656, 661 (1990)), we understand it to refer only to innocent misrepresentations by licensed real-estate professionals. Section 10b(4) is patently inapplicable to defendants.

Defendants also rely on a line of cases holding the Consumer Fraud Act inapplicable to homeowners' sale of their single-family residence to private buyers. See *Carrera v. Smith*, 305 Ill. App. 3d 1079, 1081-82, 713 N.E.2d 1282, 1284-85 (1999), citing *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d 154, 168-69, 510 N.E.2d 409, 417-18

(1986), and *Anderson v. Stowell*, 183 Ill. App. 3d 862, 863-64, 539 N.E.2d 852, 853 (1989). Defendants maintain that they built Deer Run No. 2 with the intention of living in it. The trial court did not have to believe them. Jorgensen was in the business of building and selling houses, and he was developing the subdivision in the course of that business. Defendants either held or intended to hold an open house at Deer Run No. 2 in March 1996 and had written a "spec sheet" for prospective buyers. When Kleczek asked whether defendants' alleged personal residence was for sale, it was instantly available. The trial court could reasonably have found that this was a commercial sale rather than a private sale and that *Zimmerman* and its progeny were distinguishable.

### 2. *Did Defendants Violate the Consumer Fraud Act?*

■ Defendants next argue that even if the sale comes within the Consumer Fraud Act, they did nothing to violate the statute. According to the trial court, "[d]efendant's [*sic*] statement that no notification of Plumbing Code violations had been received was a clear violation of the [Consumer Fraud] Act." In count II of their fifth-amended complaint (the count sounding in the Consumer Fraud Act), plaintiffs allege only one misrepresentation of the plumbing: the representation that defendants made on May 22, 1996, in the contract. Again, that representation was as follows:

> "[P]rior to the execution of this instrument[,] neither [the sellers] nor [the sellers'] agent have [*sic*] received any notice issued by any city, village[,] or other governmental authority of a dwelling code violation in the dwelling structure upon the premises described herein."

Defendants argue that this representation was true because the Department did not issue the notice until after the execution of the contract. They argue that the "issuance" of a notice is ordinarily understood as giving an official notice in writing. When someone merely says something orally, one does not characterize the communication as an "issuance." Only written documents are "issued," in the common usage of the term. On May 22, 1996 (the date of the representation), the Department had not yet issued its notice, and the Department did not do so until June 27. Schafer had merely told Jorgensen orally that there were plumbing violations. Defendants' interpretation of this provision of the contract is quite plausible.

"[A] statement which is technically true as far as it goes may nevertheless be fraudulent, where it is misleading because it does not state matters which materially qualify the statement as made." *St. Joseph Hospital v. Corbetta Construction Co.*, 21 Ill. App. 3d 925, 952-53, 316 N.E.2d 51, 71 (1974). In *St. Joseph Hospital*, for example,

General Electric Company represented to a contractor that some paneling, Textolite, was "not flame rated"—that is to say, not rated for its ability to catch on fire. *St. Joseph Hospital*, 21 Ill. App. 3d at 951-52, 316 N.E.2d at 69-71. By representing simply that the paneling was "not flame rated," General Electric might have given the impression that it had no data at all on the paneling's combustibility. General Electric never told the contractor or anyone else why the paneling was "not flame rated." The contractor paneled the inside of a hospital with the Textolite. As it turned out, the technicians at Underwriters Laboratory had found the paneling to be so combustible that they did not bother to rate it because it was too dangerous to use in construction. *St. Joseph Hospital*, 21 Ill. App. 3d at 951, 316 N.E.2d at 69-70. The paneling failed the Chicago building code, and General Electric was liable for fraud. Like General Electric's representation, the Jorgensons' representation might have been quite literally true, but it left out a material qualifying fact: that the Department had found violations of the plumbing code. Without the addition of that highly germane fact, the representation in the contract was misleading (or the trial court could reasonably have considered it so) in that it created the false impression that no governmental authority had informed Jorgensen of any violations of a dwelling code, including the plumbing code.

Thus, contrary to defendants' contention, there was indeed evidence of a deceptive act or practice on which defendants intended plaintiffs to rely. See 815 ILCS 505/2 (West 1996); *Siegel v. Levy Organization Development Co.*, 153 Ill. 2d 534, 542, 607 N.E.2d 194, 198 (1992). If the representation was important enough to recite it in the contract as a "warranty," defendants arguably intended plaintiffs to rely on it.

Plaintiffs also must prove that the deception proximately caused the damages they seek. See *Zankle v. Queen Anne Landscaping*, 311 Ill. App. 3d 308, 312, 724 N.E.2d 988, 992 (2000). Defendants point out that when the parties signed the contract, Jorgensen already had repaired the plumbing defects that Schafer had pointed out to him. Nevertheless, the trial court still could have found proximate cause. The court could have concluded that if defendants had told plaintiffs that a governmental inspector had found plumbing defects, plaintiffs would have suspected that whoever had installed the plumbing had not done a competent job. Then they could have hired a licensed plumber of their choice to perform a comprehensive inspection of the plumbing and to identify the defects that they ended up having to fix later (regardless of whether the Department had identified all of the defects or not). We conclude that Jorgenson's repairing (or allegedly

repairing) the plumbing defects that Schafer had identified did not necessarily render the deception harmless, considering that, at the end of the day, some apparently major plumbing defects remained.

Jorgensen testified that when Patricia Kleczek first came to look at the house, after the execution of the contract but before the closing, he told her that the plumbing inspector had come and that as a result of the inspection, some plumbing had to be changed. The trial court need not have believed Jorgensen. The trial court could instead have believed Patricia Kleczek, who testified that the first time she realized that the Department had "been involved" was on April 29, 1997, several months after the closing, when Schafer reinspected the plumbing in Deer Run No. 2 at plaintiffs' request.

We will not disturb the trial court's finding unless the finding was manifestly erroneous. *Breckenridge v. Cambridge Homes, Inc.*, 246 Ill. App. 3d 810, 822, 616 N.E.2d 615, 623 (1993). The finding that defendants violated the Consumer Fraud Act is not manifestly erroneous, and we affirm the judgment in that respect.

■ We disagree with the trial court, however, that the breach of the "1[-][y]ear [w]orkmanship [g]uarantee" was a violation of the Consumer Fraud Act. As the Second District recently explained, a deceptive act or practice "involves more than the mere fact that a defendant promised something and then failed to do it. That type of 'misrepresentation' occurs every time a defendant breaches a contract." *Zankle*, 311 Ill. App. 3d at 312, 724 N.E.2d at 993; see also *Price v. Highland Community Bank*, 722 F. Supp. 454, 459-60 (N.D. Ill. 1989) (Posner, J., holding that "[a] change of mind can be *** a breach of contract, but it is not fraud"), *aff'd*, 932 F.2d 601 (7th Cir. 1991). "Were our courts to accept plaintiff's assertion that promises that go unfulfilled are actionable under the Consumer Fraud Act, consumer plaintiffs could convert any suit for breach of contract into a consumer[-]fraud action." *Zankle*, 311 Ill. App. 3d at 312, 724 N.E.2d at 992.

Defendants acknowledged the warranty and, in fact, made repairs to Deer Run No. 2 in accordance with it. Only after the parties' relationship soured did defendants refuse to honor the warranty. This does not strike us as a fraud in the making of the contract but, rather, as exactly the type of breach of contract or express warranty that the Consumer Fraud Act does not cover. We are further persuaded to make this distinction by plaintiffs' recognition, in count IV of their fifth-amended complaint, that the breach of the express warranty existed as a separate cause of action for defendants' failure to honor the one-year workmanship guarantee. The trial court erred in finding that defendants violated the Consumer Fraud Act by offering and

then disavowing the warranty. The error was harmless. A single deceptive practice or misrepresentation qualifies as a violation of the Consumer Fraud Act. *Breckenridge*, 246 Ill. App. 3d at 822, 616 N.E.2d at 623. The representation, in the contract, that the Jorgensons had received no notice of any violation of a dwelling code could be considered misleading under the circumstances. Thus, the trial court's judgment on count II was not manifestly erroneous.

## B. Attorney Fees

Section 10a(c) of the Consumer Fraud Act says that the court may award attorney fees to the prevailing party. 815 ILCS 505/10a(c) (West 1996). Defendants argue that the award of attorney fees is excessive because the court awarded fees for work that plaintiffs' attorneys did on claims other than the one under the Consumer Fraud Act. Plaintiffs won only $4,216.11 for the plumbing. Defendants assert that plaintiffs could not possibly have run up $38,896 in fees and expenses in litigating a claim for $4,216.11.

■ Whether to award attorney fees lies within the trial court's discretion, and we will not overturn such an award unless the trial court abused its discretion. *Grove v. Huffman*, 262 Ill. App. 3d 531, 539, 634 N.E.2d 1184, 1189 (1994), citing *Ekl v. Knecht*, 223 Ill. App. 3d 234, 246, 585 N.E.2d 156, 166 (1991). Generally, the cases hold that unless the proofs of the statutory claim and of the nonstatutory claim are the same, the prevailing party must differentiate between the work done on the statutory claim and the work done on the nonstatutory claim. See *Schorsch v. Fireside Chrysler-Plymouth, Mazda, Inc.*, 286 Ill. App. 3d 1028, 1031-32, 677 N.E.2d 976, 979 (1997); *Roche v. Fireside Chrysler-Plymouth, Mazda, Inc.*, 235 Ill. App. 3d 70, 87, 600 N.E.2d 1218, 1229 (1992); *Rubin v. Marshall Field & Co.*, 232 Ill. App. 3d 522, 534, 597 N.E.2d 688, 695-96 (1992); *Ciampi v. Ogden Chrysler Plymouth, Inc.*, 262 Ill. App. 3d 94, 114-15, 634 N.E.2d 448, 463 (1994); *Grove*, 262 Ill. App. 3d at 539, 634 N.E.2d at 1190.

■ Plaintiffs brought actions for breach of the implied warranty of habitability, breach of an express warranty, common-law fraud, and violations of the Consumer Fraud Act. The proofs of common-law fraud were indistinguishable from those of the Consumer Fraud Act. Facts supporting a finding of common-law fraud necessarily support a violation of the Consumer Fraud Act, if the fraud was committed in the conduct of trade or commerce. *Siegel*, 153 Ill. 2d at 543, 607 N.E.2d at 198. As to those issues, we do not find any abuse of discretion in the trial court's award.

We find that the trial court abused its discretion, however, in awarding fees and expenses for plaintiffs' prosecution of the warranty

claims. Plaintiffs argue that the claims are factually indistinguishable, having "something to do with the one[-]year workmanship guarantee, the false warranty in the purchase agreement, the plumbing problems, and [d]efendants' deceptive acts and omissions." We already have said that the trial court erred in holding that the breach of the one-year workmanship guarantee was a violation of the Consumer Fraud Act. Moreover, the court found that plaintiffs had abandoned their claim for breach of express warranty as an independent cause of action.

While we acknowledge that the breach of the implied warranty of habitability did involve the plumbing defects, it also was based in part on the structural defects in Deer Run No. 2. Our review of the record persuades us to accept defendants' argument that much of the trial was given to a discussion of these habitability matters, which are factually distinct from any fraudulent conduct of defendants. The portions of the trial (and the attorneys' preparation) pertaining to the habitability theory are not so intertwined with the common-law and consumer-fraud theories as to be indistinguishable from them. Different experts were called as to each theory; the attorneys' time in contacting them could be separated out.

Moreover, the trial court heard only evidence of the reasonableness of plaintiffs' attorney fees and not of the division of the attorneys' time. Insofar as the trial court may have awarded fees for representation on matters other than the Consumer Fraud Act claim, the court's award of nearly all of plaintiffs' attorney fees was erroneous. We vacate the trial court's award of attorney fees and remand for a further hearing on this issue in accordance with the views expressed herein.

## C. Punitive Damages

■ Plaintiffs contend, on cross-appeal, that the trial court erred in denying their prayer for punitive damages. We disagree. Section 10a(a) of the Consumer Fraud Act permits the trial court, in its discretion, to award punitive damages. 815 ILCS 505/10a(a) (West 1996). However, courts should award punitive damages only for conduct that is outrageous, either because the defendant's motive was evil or the acts showed a reckless disregard of others' rights. *Totz v. Continental Du Page Acura*, 236 Ill. App. 3d 891, 909, 602 N.E.2d 1374, 1386 (1992). The purpose of awarding punitive damages is to punish the wrongdoer and, in doing so, deter that party and others from committing similar wrongful acts. *Totz*, 236 Ill. App. 3d at 909, 1602 N.E.2d at 1386. Punitive damages are not favored in the law; thus, courts should be careful never to award such damages improperly or unwisely. *Kleidon v. Rizza Chevrolet, Inc.*, 173 Ill. App. 3d 116, 121, 527 N.E.2d 374, 377 (1988).

■ In reviewing a decision on punitive damages, an appellate court

must not disturb the trial court's decision unless the trial court abused its discretion. *Beaton & Associates, Ltd. v. Joslyn Manufacturing & Supply Co.*, 159 Ill. App. 3d 834, 846, 512 N.E.2d 1286, 1293 (1987). A court abused its discretion only if no reasonable person could agree with the court. See, *e.g.*, *In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 831, 633 N.E.2d 82, 94 (1994). Here, the trial court held a full evidentiary hearing on punitive damages and then denied the requested relief. It does not appear that the trial court abused its discretion. The court could well have found that defendants' deceptive or fraudulent conduct was not the result of an evil motive or undertaken with a reckless disregard for the rights of others. Plaintiffs' attempts to convince us otherwise are unavailing.

### D. Prejudgment Interest

■ Plaintiffs also argue on cross-appeal that the trial court erred in denying prejudgment interest. For similar reasons, we disagree. "In Illinois, prejudgment interest may be recovered when warranted by equitable considerations, and disallowed if such an award would not comport with justice and equity." *In re Estate of Wernick*, 127 Ill. 2d 61, 87, 535 N.E.2d 876, 888 (1989). The goal of proceedings sounding in equity is to make the injured party whole. *Wernick*, 127 Ill. 2d at 86, 535 N.E.2d at 887. However, the determination of the equities of the case is "a matter lying within the sound discretion of the trial judge. [Citations.] Such a determination will not be disturbed on review unless it constitutes an abuse of discretion." *Wernick*, 127 Ill. 2d at 87, 535 N.E.2d at 888.

■ As with the issue of punitive damages, a reviewing court ought not substitute its judgment for that of the trial court unless no reasonable person could adopt the trial court's position. *Beaton & Associates, Ltd.*, 159 Ill. App. 3d at 846, 512 N.E.2d at 1293; *Dunseth*, 260 Ill. App. 3d at 831, 633 N.E.2d at 94. Here, the trial court held a full evidentiary hearing on the issue of prejudgment interest and then denied the requested relief. The evidence presented showed that after the plaintiffs moved out of Deer Run No. 2, they rented the residence for two years. Plaintiffs thereby realized income for the period they were allegedly deprived of the use of the purchase price. The trial court was in the best position to determine the effect of this income on the equities of the case and whether rescission alone would make plaintiffs whole. We do not find that the trial court abused its discretion in denying prejudgment interest.

### E. Request for Further Modification of Judgment

Plaintiffs next argue that the trial court erred in refusing to further modify the judgment to summarily award them the difference be-

tween the rescission amount and the sale price, instead inviting them to file a sixth-amended complaint and to prove such damages in an evidentiary hearing.

■ Our research reveals no Illinois case directly on point, but a legal encyclopedia says: "Seeking relief by rescission is not deemed an election so irrevocable as to preclude an amendment claiming damages for the fraud, although there is contrary authority." 37 Am. Jur. 2d *Fraud & Deceit* § 461 (2001). The cases that the article cites are old and from other jurisdictions, but their reasoning seems sound. For example, the Supreme Court of Indiana said, in *Cohoon v. Fisher*, 146 Ind. 583, 587, 45 N.E. 787, 788 (1897):

> "No one will deny the right to abandon a suit for rescission. Its abandonment involves the affirmation of the contract. Then if the plaintiff may abandon it, and thereby affirm the contract, that is all he does when he sues for damages caused by the fraud in the procurement of the contract."

The court held that the plaintiff could amend his complaint for rescission so as to make it a complaint to recover damages for fraud. *Cohoon*, 146 Ind. at 586-89, 45 N.E. at 788-89.

A common thread running through these cases is that the plaintiff changed the complaint from one for rescission to one for damages by amending it. See *Friederichsen v. Renard*, 247 U.S. 207, 209, 62 L. Ed. 1075, 1082, 38 S. Ct. 450, 450 (1918); *Reinertson v. Struthers*, 201 Iowa 1186, 1187-92, 207 N.W. 247, 248-50 (1926). Section 2—604 of the Code of Civil Procedure says:

> "Every complaint *** shall contain specific prayers for the relief to which the pleader deems himself or herself entitled ***. Except in cases of default, the prayer for relief does not limit the relief obtainable, but where other relief is sought[,] the court shall, by proper orders, and upon terms that may be just, protect the adverse party against prejudice by reason of surprise." 735 ILCS 5/2—604 (West 1996).

■ Section 2—616(c) of the Code of Civil Procedure says: "A pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just." 735 ILCS 5/2—616(c) (West 1996).

■ The trial court required plaintiffs to file a sixth-amended complaint and to "reopen [the] evidence" to protect defendants from surprise. After the trial and final judgment, plaintiffs demanded a remedy that was absolutely inconsistent with the rescission that they had sought in their fifth-amended complaint and had obtained. The general prayer, in their fifth-amended complaint, for "any other relief as the court deems equitable and proper" was not a "specific prayer"

within the meaning of section 2—604 and did not forewarn defendants that plaintiffs would seek the difference in value between the rescission amount and the sale price as a measure of damages. See *Rauscher v. Albert*, 145 Ill. App. 3d 40, 43-44, 495 N.E.2d 149, 151 (1986).

In *Braner USA, Inc. v. CM Technologies, Inc.*, 285 Ill. App. 3d 1079, 1079, 674 N.E.2d 942, 943 (1996), the plaintiff brought an action for damages against the defendant, alleging the breach of a contract to sell and install computer software. Although the plaintiff never mentioned the remedy of rescission until closing arguments and the complaint did not request rescission, the trial court concluded that the defendant had received adequate notice of the plaintiff's intention to seek rescission, and it granted that remedy. *Braner*, 285 Ill. App. 3d at 1080-81, 674 N.E.2d at 943. Although the plaintiff asserted that he was ready to restore the defendant to the status quo (a precondition of rescission), he had presented no evidence at trial that he could do so. *Braner*, 285 Ill. App. 3d at 1081-82, 674 N.E.2d at 944. In reversing the trial court's award of rescission, the appellate court said:

> "There are certain pitfalls to be considered upon the granting of a remedy not contemplated by the pleadings. Although a prayer for relief does not limit the relief obtainable, where other relief is sought[,] the trial court has a duty to protect the opposing party 'against prejudice by reason of surprise.' 735 ILCS 5/2—604 (West 1992). In the present case, in addition to Braner's failing to offer evidence on an essential component of the remedy of rescission, CMT was unable to challenge Braner's ability to restore the status quo and, consequently, was unable to defend itself against imposition of this equitable remedy." *Braner*, 285 Ill. App. 3d at 1082, 674 N.E.2d at 944.

By requiring plaintiffs to file a sixth-amended complaint and to prove their new claim for monetary damages in an evidentiary hearing (with the cross-examination of witnesses and the presentation of rebuttal witnesses), the trial court was protecting defendants "against prejudice by reason of surprise." See 735 ILCS 5/2—604 (West 1996). Plaintiffs were unwilling to accept those conditions, and the trial court rightfully denied their petition for a further modification of the judgment.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment in part, vacate in part, and remand for further proceedings on the separa-

tion of those attorney fees incurred in pursuing the Consumer Fraud Act claim.

Affirmed in part and vacated in part; cause remanded with directions.

MYERSCOUGH and TURNER, JJ., concur.