2015 IL App (1st) 123452

FOURTH DIVISION
September 30, 2015

No. 1-12-3452

| | |
|---|---|
| BOARD OF MANAGERS OF PARK POINT AT WHEELING CONDOMINIUM ASSOCIATION, | ) ) |
| | ) Appeal from |
| Plaintiff-Appellant, | ) the Circuit Court |
| | ) of Cook County |
| v. | ) |
| | ) 08-L-09404 |
| PARK POINT AT WHEELING, LLC, S.M. SMITH AND SONS, INC. | ) |
| d/b/a SMITH AND SONS, INC., SMITH FAMILY CONSTRUCTION, | ) Honorable |
| INC., HIRSCH AND ASSOCIATES, LLC, MIDWEST MASONRY, | ) Lynn M. Egan, |
| INC., G.W. THIEL, INC., VIVIAN J. SMITH, SILVERLINE | ) Judge Presiding |
| BUILDING PRODUCTS  CORPORATION, and THERMOLOCK | ) |
| MANUFACTURING, LLC, | ) |
| | ) |
| Defendants-Appellees. | ) |

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justice Palmer and Justice Gordon concurred in the judgment and opinion.

**OPINION**

¶ 1    This interlocutory appeal concerns the dismissal of claims that various parties involved in

the design, construction, and sale of a condominium complex that was completed in 2004

breached the implied warranty of habitability by incorporating latent defects into the units and

common elements. The implied warranty regarding latent defects in new construction is

generally imposed against builders or builder-sellers only and the trial court found that the

homeowners' group, Board of Managers of Park Point at Wheeling Condominium Association,

failed to state a claim against the project architect, Hirsch and Associates, LLC (Hirsch). The

condominium association asks us to recognize a claim against the architect by extending *Minton*

*v. The Richards Group of Chicago*, 116 Ill. App. 3d 852, 452 N.E.2d 835 (1983), in which the

court extended the implied warranty to a subcontractor because the builder-seller was judgment-

proof and the solvent subcontractor was the cause of a latent defect. The second issue on appeal is whether warranty disclaimer language in each condominium purchase contract was conspicuous and protected not only the developer-seller, but also its original and successor general contractors and subcontractors. The condominium association also asks us to reverse the denial of a motion for reconsideration.

¶ 2       The condominium project at issue is known as Park Point at Wheeling and consists of three midrise buildings and 128 units situated on almost six acres of land at 620, 640, and 660 McHenry Road. The architect's plans for the condominium complex were completed in approximately 2000 and construction of the buildings was completed between 2001 and 2004. The architect is not alleged to have taken part in the construction or sale of the units.

¶ 3       The condominium association filed suit in 2008 and after a series of amendments culminating in a sixth amended complaint filed in 2011, asserted a total of eight claims against architect Hirsch; the project's developer-seller, Park Point at Wheeling, LLC; the original and successor general contractors, S.M. Smith & Sons, Inc., d/b/a Smith & Sons and Smith Family Construction, Inc. (collectively Smith); the carpentry subcontractor, G.W. Thiel, Inc. (G.W. Thiel); the masonry subcontractor, Midwest Masonry, Inc. (Midwest); the window and patio door manufacturers; and their agents. Parties that we have not identified by name were either dismissed by court order or settlement agreement and are not participating in this interlocutory appeal. Counts II and III are the implied warranty of habitability claims and are the only counts at issue here. Count II was directed at the developer-seller. Count III concerned the architect and the other defendants.

¶ 4       The condominium association complained that water and air infiltration was damaging interior flooring and finishes. The association attributed the infiltration to latent defects in the

design, material, and construction of the common elements and limited common elements, including masonry walls which lacked intermediate support, windows and patio doors that leaked, and flashing, caps, and dams that were insufficient to divert water. These alleged defects did not become apparent until 2007. The estimated cost of repairs exceeded $4 million. The association also alleged, on information and belief, that the developer-seller was insolvent and incapable of satisfying a $4 million award. The association further alleged, on information and belief, that it had no recourse against the original general contractor, because that entity was insolvent and no longer doing business, and had no recourse against the successor general contractor, because, on information and belief, that entity had either no assets or insufficient assets to satisfy a $4 million award.

¶ 5    The trial court orders dismissing the implied warranty of habitability claims pursuant to sections 2-615 and 2-619(a) of the Code of Civil Procedure (Code) allow for this interlocutory appeal pursuant to Supreme Court Rule 304(a). 735 ILCS 5/2-615, 2-619(a) (West 2012); Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010).

¶ 6    Turning first to the dismissal of the claim against the architect, we offer the following overview of the law. We note that the theory of implied warranty of habitability in construction arose because the application of the common law principles of *caveat emptor* and merger meant that a disappointed new home buyer had little or no recourse against a builder that erected a defective residence. *Petersen v. Hubschman Construction Co.*, 76 Ill. 2d 31, 38, 389 N.E. 1154, 1179 (1979). Historically, a new home buyer took the property at his own risk and if he failed to discover defects before the transfer, *caveat emptor* prevented him from maintaining a suit against the builder. *Petersen*, 76 Ill. 2d at 38, 389 N.E.2d at 1179. Similarly, under the merger doctrine, all agreements between a new home seller and buyer merged in the deed and if the document did

1-12-3452

not include reservations, once the buyer received the document, he had no right to complain about the quality of his new property. *Petersen*, 76 Ill. 2d at 38, 389 N.E.2d at 1179.

¶ 7     The doctrine of *caveat emptor*, however, is based on an expectation that buyer and seller possess comparable skill and experience and engage in an arm's length transaction. *Tuck v. Downing*, 76 Ill. 71, 93 (1875) ("The parties were dealing at arm's length and on equal grounds, and their own judgments were to be their guide in coming to a conclusion."). Implying a warranty of habitability into the contract for the sale of a new residence was a judicial response to the fact that in the twentieth century, new home buyers and sellers were no longer in an equal bargaining position. *Caveat emptor* fell out of favor as home building methods and governmental regulations became more complex, builders grew in scale and became specialized, and the ordinary home buyer no longer had the skill or training to make a meaningful inspection and discover latent defects. *Tavares v. Horstman*, 542 P.2d 1275 (Wyo. 1975).

¶ 8     Our supreme court has cited three public policy reasons for adopting the implied warranty of habitability doctrine in this jurisdiction: (1) the modern home buyer is unusually dependent upon the competency and honesty of the builder rather than on the buyer's own ability to discern latent defects, (2) the buyer is making the largest single investment of his or her life, and, (3) in fairness, the repair costs of defective construction should be borne by the builder-seller who created the latent defects. *1324 W. Pratt Condominium Ass'n v. Platt Construction Group, Inc.*, 404 Ill. App. 3d 611, 616-17, 936 N.E.2d 1093, 1098 (2010) (*Pratt I*).

¶ 9     To avoid the merger doctrine, the implied warranty has been treated as an independent undertaking to the covenant to convey and one that survives the delivery of the deed. *Redarowicz v. Ohlendorf*, 92 Ill. 2d 171, 182, 441 N.E.2d 324, 329 (1982); *Petersen*, 76 Ill. 2d at 41, 389 N.E.2d at 1158.

¶ 10    By the mid 1970s, about half of the United States had abandoned *caveat emptor* in the context of new home sales. *Redarowicz*, 92 Ill. 2d at 182, 441 N.E.2d at 329. In Illinois, the state supreme court first adopted the implied warranty of habitability doctrine in 1972 in a landlord-tenant case and in 1979 in *Petersen* the court expanded it to contract for the sale of a new home by the builder-seller. *Pratt I*, 404 Ill. App. 3d at 616, 936 N.E.2d at 1098-98 (citing *Jack Spring, Inc. v. Little*, 50 Ill. 2d 351, 280 N.E.2d 208 (1972),[1] *Petersen*, 76 Ill. 2d 31, 389 N.E.2d 1154). In *Petersen*, the buyers found defects in the home during the construction phase and attempted to negotiate a compromise with the builder-seller, but, numerous problems persisted. When the buyers refused to close on the purchase, the builder-seller declared a forfeiture, and then the buyers sued for return of their earnest money and for the value of labor and materials they contributed to the project. *Petersen*, 76 Ill. 2d at 35-36, 389 N.E.2d at 1155-56. The home's problems included a defective front door, bay window, basement floor, and problems with the interior drywall and the exterior siding. *Petersen*, 76 Ill. 2d at 36, 389 N.E.2d at 1156. In defining the warranty of habitability of construction, the supreme court characterized the use of the term of "habitability" as "unfortunate" because that term is easily misconstrued and implies

---

[1]In the landlord tenant case, the supreme court explained that the common law rule absolving a landlord of any obligation to repair housing dated to the agrarian economy of the early Middle Ages, when the farmable land was more important than whatever structures might be included in the lease and the tenant was capable of making any necessary repairs. *Jack Spring*, 50 Ill. 2d at 363-64, 280 N.E.2d at 215-16. Unlike the farmer who was likely to lease one piece of land for his entire life, the modern urban tenant is mobile, lacks the skill to maintain structures, and cannot justify the effort and expense of repairing leased property. *Jack Spring*, 50 Ill. 2d at 363-64, 280 N.E.2d at 215-16.

that the warranty is satisfied when a house is merely capable of being inhabited. *Petersen*, 76 Ill. 2d at 41, 389 N.E2.d at 1158. In fact, prior to *Petersen*, the warranty of habitability was found to be violated only where a home did not keep out the elements or provide a reasonably safe place to live. *Park v. Sohn*, 90 Ill. App. 3d 794, 797-98, 414 N.E.2d 1, 3-4 (1980). The supreme court therefore suggested that the meaning of the warranty would be more accurately conveyed through language similar to the language used in the Uniform Commercial Code's warranties of merchantability or fitness for a particular purpose. *Peterson*, 76 Ill. 2d at 41-42, 389 N.E.2d at 1158 (citing sections 2-314 and 2-315 of the Uniform Commercial Code (now 735 ILCS 5/2-314, 2-315 (West 2012))).

¶ 11    The new home buyer has a right to expect to receive what was bargained for and what the builder-seller agreed to construct and convey, which is a house that is reasonably fit for its intended use as a residence. *Petersen*, 76 Ill. 2d at 40, 389 N.E.2d at 1158. The trial court ruled, and the supreme court agreed, that *Petersen*'s builder-seller did not substantially perform the contract, could not declare a forfeiture, and had to return the earnest money and the value of labor and materials that were contributed by the buyers. *Petersen*, 76 Ill. 2d at 35, 389 N.E.2d at 1155-56.

¶ 12    Since then, the class of defendants who impliedly warrant the habitability of their construction work has expanded only somewhat from the builder-sellers of new homes. For instance, in *Tassan*, the court applied the doctrine to the developer-seller of a new condominium unit. *Tassan v. United Development Co.*, 88 Ill. App. 3d 581, 410 N.E.2d 902 (1980). The court reiterated that the fundamental reason for imposing the implied warranty regarding construction work is the unusual dependency of the buyer/homeowner:

"Purchasers from a *builder*-seller depend on his ability to construct and sell a home of

sound structure. Purchasers from a *developer*-seller depend on his ability to hire a contractor capable of building a home of sound structure. The buyers here had no control over [the developer's] choice of a builder. [The developer] stood in the best position to know which contractor could perform the work adequately. The dependent relationship here between the buyers and [the developer] is the same as if [the developer] was a builder-seller. Necessarily, we hold that [the developer] could be deemed to have made an implied warranty of habitability in this case." (Emphases added.) *Tassan*, 88 Ill. App. 3d at 587, 410 N.E.2d at 908.

¶ 13    In *Herlihy*, the implied warranty was applied to a developer-seller with respect to construction defects in common elements of a new condominium complex (*Herlihy v. Dunbar Builders Corp.*, 92 Ill. App. 3d 310, 415 N.E.2d 1224 (1980)), and in *VonHoldt*, the court extended the doctrine to a contractor that created latent defects by disregarding the architect's plans for constructing a multilevel home addition which increased the size of the original residence by almost 40% (*VonHoldt v. Barba & Barba Construction, Inc.*, 175 Ill. 2d 426, 677 N.E.2d 836 (1997)).

¶ 14    We point out that regardless of the exact role the defendant played in each of these projects, the implied warranty of habitability claim centered on the quality of construction work. Regardless of whether a new property is a single family home, a condominium unit, or a major addition, the ordinary person is not knowledgeable of contemporary construction practices and must to a substantial degree rely on the integrity and skill of the builder or on the entity that has chosen the builder. *Petersen*, 76 Ill. 2d at 40, 389 N.E.2d at 1158 ("In most instances, the latent defects would not be discoverable by a [buyer] whether the house is complete or incomplete at the time the contract is entered into."); *Herlihy*, 92 Ill. App. 3d at 315, 415 N.E.2d at 1227

(stating, "[buyers] of condominium units, just as buyers of single family residences, often are not knowledgeable in construction practices"); *VonHoldt*, 175 Ill. 2d at 432, 677 N.E.2d at 839 ("the owner of the house usually has little knowledge regarding the construction" and is incapable of discovering hidden defects even through the exercise of ordinary and reasonable care).

¶ 15     Thus, generally speaking, only builders or builder-sellers warrant the habitability of their construction work. Engineers and design professionals such as the Hirsch architectural firm provide a service and do not warrant the accuracy of their plans and specifications. 5 Phillip L. Bruner & Patrick J. O'Connor, Jr., Bruner & O'Connor on Construction Law § 17:24 (2002) (discussing warranty liability of design professional); Sam A. Mackie, *Architect's Negligence*, 33 Am. Jur. Proof of Facts 3d 57, § 5 (1995) ("[A]bsent an express contractual provision to the contrary, an architect does not guarantee the owner a perfect plan or a satisfactory result. The architect is not liable for mere errors of judgment, and liability attaches only when the architect's conduct falls below the standard of skill and care exercised by others engaged in the same profession, and in the same locality.").

¶ 16     In fact, breach of implied warranty of habitability claims against design professionals have already been rejected in Illinois and most other jurisdictions. For instance, in *Paukovitz*, a new homeowner in Marseilles, Illinois, sued the designer of his residence for breach of the implied warranty of habitability after discovering that his home suffered from structural damage because the basement walls were inadequately supported. *Paukovitz v. Imperial Homes, Inc.*, 271 Ill. App. 3d 1037, 659 N.E.2d 473 (1995). The home was built into a hillside and situated so that the basement door would be at ground level. *Paukovitz*, 271 Ill. App. 3d at 1038, 659 N.E.2d at 474. The home designer had sold the plans as well as some of the home's shell materials to the builder. *Paukovitz*, 271 Ill. App. 3d at 1038, 659 N.E.2d at 475. The trial court dismissed the

homeowner's breach of warranty claims against the designer and the appellate court affirmed the ruling, holding that the designer's role did not subject it to a claim for breach of the warranty of habitability of the builder's work. *Paukovitz*, 271 Ill. App. 3d at 1039, 659 N.E.2d at 475.

"It is undisputed that [the designer] Imperial did no construction work on Paukovitz' home. It only supplied the shell materials and the plans which [the builder] Vignali then used to construct the residence. The parties do not cite, and we are unable to find, any reported cases in which a court held that the supplier of plans and shell materials was a builder-vendor for the purposes of the implied warranty of habitability. Moreover, in every case cited by Paukovitz to support his contention that Imperial was the builder-vendor, the defendant had conducted some kind of construction work on the home in question. Inasmuch as Imperial did not contribute to the actual construction of Paukovitz' home, we find that it was not a builder-vendor which could be held liable for the breach of the implied warranty of habitability." *Paukovitz*, 271 Ill. App. 3d at 1039, 649 N.E.2d at 475.

¶ 17    Other jurisdictions that have addressed this issue have also concluded that a design professional may not be sued under an implied warranty theory for providing professional services. Furthermore, the principle that an architect does not warrant or guarantee perfection in his or her plans and specifications is a long standing principle. More than a 100 years ago, in a payment dispute, a Michigan defendant argued that his building costs had been increased by flawed plans and specifications and that the architect's compensation should be reduced accordingly. *Chapel v. Clark*, 76 N.W. 62, 62 (Mich. 1898). The Michigan Supreme Court surveyed other jurisdictions and held that the law does not imply a warranty or guarantee of perfection in architectural work. *Chapel*, 76 N.W. at 62. An architect is expected to exercise only

ordinary skill and care *Chapel*, 76 N.W. at 62. Performing to that standard sometimes results in defects or unsafe conditions. *Chapel*, 76 N.W. at 62.

¶ 18    In a contemporary Wyoming case, an architectural firm sued an engineering firm, arguing that the engineer impliedly agreed to provide a " 'useful' " and "' workable' " heating, ventilation, and air conditioning system for a new building in Cheyenne. *Kemper Architects, P.C. v. McFall, Konkel & Kimball Consulting Engineers, Inc.*, 843 P.2d 1178, 1186 (Wyo. 1992). The court disagreed, stating simply that the "implied warranty of fitness for a particular purpose is applicable to contracts for the sale of goods, not for professional services." *Kemper Architects,* 843 P.2d at 1186. "An engineer, or any other so-called professional, does not 'warrant' his service or the tangible evidence of his skill to be 'merchantable' or 'fit for an intended use.' These are terms uniquely applicable to goods. Rather, *** the engineer or architect 'warrants' that he will or has exercised his skill according to a certain standard of care, that he acted reasonably and without neglect." *Kemper Architects,* 843 P.2d at 1186.

¶ 19    Similarly, in Minnesota, where an addition to a municipal building allowed water to seep into the basement, the city filed various claims against the architect. *City of Mounds View v. Walijarvi*, 263 N.W.2d 420 (Minn. 1978). The Minnesota supreme court disposed of the claims that relied on implied warranty/strict liability (*City of Mounds View*, 263 N.W.2d at 423), and instead followed the traditional rule that imposes liability on architects and other professional service providers only where professional negligence is proved. *City of Mounds View*, 263 N.W.2d at 425. Contrary to the current appellant's argument, the court distinguished the architect's role from that of the home's builder or contractor:

> " 'In an examination of the merits of the controversy between these parties, we must
>
> bear in mind that the (architect) was not a contractor who had entered into an agreement

to construct a house for the (owner), but was merely an agent of the (owner) to assist him in building one. The responsibility resting on an architect is essentially the same as that which rests upon the lawyer to his client, or upon the physician to his patient ***. The undertaking of an architect implies that he possesses skill and ability, including taste, sufficient to enable him to perform the required services at least ordinarily and reasonably well; and that he will exercise and apply in the given case his skill and ability, his judgment and taste, reasonably and without neglect. But the undertaking does not imply or warrant a satisfactory result." *City of Mounds View*, 263 N.W.2d at 423 (quoting *Coombs v. Beede,* 36 A. 104, 104-05 (Me. 1896)).

¶ 20    The Minnesota Supreme Court characterized the efforts of architects and engineers as "inexact sciences:"

"The reasoning underlying the general rule as it applies both to architects and other vendors of professional services is relatively straightforward. Architects, doctors, engineers, attorneys, and others deal in somewhat inexact sciences and are continually called upon to exercise their skilled judgment in order to anticipate and provide for random factors which are incapable of precise measurement. The indeterminable nature of these factors makes it impossible for professional service people to gauge them with complete accuracy in every instance. Thus, doctors cannot promise that every operation will be successful; a lawyer can never be certain that a contract he drafts is without latent ambiguity; and an architect cannot be certain that a structural design will interact with natural forces as anticipated. Because of the inescapable possibility of error which inheres in these services, the law has traditionally required, not perfect results, but rather the exercise of that skill and judgment which can be reasonably expected from similarly

situated professionals. ***

***

We have reexamined our case law on the subject of professional services and are not persuaded that the time has yet arrived for the abrogation of the traditional rule. Adoption of the city's implied warranty theory would in effect impose strict liability on architects for latent defects in the structures they design. That is, once a court or jury has made the threshold finding that a structure was somehow unfit for its intended purpose, liability would be imposed on the responsible architect in spite of his diligent application of state - of - the - art design techniques. If every facet of structural design consisted of little more than the mechanical application of immutable physical principles, we could accept the rule of strict liability which the city proposes. But even in the present state of relative technological enlightenment, the keenest engineering minds can err in their most searching assessment of the natural factors which determine whether structural components will adequately serve their intended purpose. Until the random element is eliminated in the application of architectural sciences, we think it fairer than the purchaser of the architect's services bear the risk of such unforeseeable difficulties." *City of Mounds View,* 263 N.W.2d at 424.

¶ 21 Similar reasoning was applied in *Board of Trustees of Union College v. Kennerly, Slomanson & Smith*, 400 A.2d 850 (N.J. Super. Ct. Law Div. 1979), in which a New Jersey college sued an architectural and engineering firm, claiming that the engineer impliedly warranted that a design for a lighting system for a parking lot would be reasonably fit for its intended use. The court rejected this argument, noting that a majority of jurisdictions have refused to extend the implied warranty theory to the performance of architectural and

engineering services. *Board of Trustees of Union College*, 400 A.D. at 852. See also 5 Phillip L. Bruner & Patrick J. O'Connor, Jr., Bruner & O'Connor on Construction Law § 17:24 (2002) (summarizing that while implied warranties are customary in the sale of products, most jurisdictions have rejected the application of implied warranties to the rendering of professional services such as architecture and engineering); Sam A. Mackie, *Architect's Negligence*, 33 Am. Jur. Proof of Facts 3d 57, § 7 at 74-75 (2015) (noting that some jurisdictions have held that the technical drawings, services, and information which are supplied by an architect do not constitute a product, and that what the architect actually provides is a service); *Samuelson v. Chutich*, 529 P.2d 631, 633 (Colo. 1974) ("we regard it as the better part of wisdom not to extend as a matter of law implied warranties from [sales of products to service contracts]"); *Johnson-Voiland-Archuleta, Inc. v. Roark Associates*, 572 P.2d 1220 (Colo. App. 1977) (engineers prepare drawings and specifications for construction projects, which is a professional service, they do not sell goods and are not subject to the implied warranty of fitness for intended use); *Audlane Lumber & Builders Supply, Inc. v. D.E. Britt Associates, Inc.*, 168 So. 2d 333, 335 (Fla. Dist. Ct. App. 1964) (an engineer or architect preparing designs and specifications to be used in construction must act reasonably and without neglect; but he does not warrant his professional service or the tangible evidence of his skill to be merchantable or fit for an intended use; those are terms that are "uniquely applicable to goods"). *Cf. Beachwalk Villas Condominum Ass'n v. Martin*, 406 S.E.2d 372 (S.C. 1991) (holding that an architect could be held liable to condominium buyers for negligence and breach of implied warranty of habitability despite their lack of contractual privity).

¶ 22    Thus, two principles become clear from the case law. First, the implied warranty of habitability of construction is traditionally applied to those who engage in construction. Second,

architects do not construct structures, they perform design services pursuant to contracts which set out their obligations and courts have consistently declined to heighten their express contractual obligations by implying a warranty of habitability of construction.

¶ 23    Nonetheless, the condominium association argues for a different result and contends it was error for the trial court to dismiss the amended claim against the architect. A motion to dismiss pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2012)), challenges the legal sufficiency of a complaint based on defects apparent on its face. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429, 856 N.E.2d 1048, 1053 (2006). On review, we consider "whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted." (Internal quotation marks omitted.) *Karas v. Strevell*, 227 Ill. 2d 440, 451, 884 N.E.2d 122, 129 (2008). When we review the sufficiency of a complaint, we consider the issue *de novo*. *Karas*, 227 Ill. 2d at 451, 884 N.E.2d 122. We first accept as true all well-pled facts in the complaint and any uncontradicted affidavits and we draw all reasonable inferences from those facts, and then determine whether the moving party is entitled to judgment as a matter of law. *1324 W. Pratt Condominium Ass'n v. Platt Construction Group, Inc.*, 2012 IL App (1st) 111474, ¶ 21, 974 N.E.2d 279 (*Pratt II*). A cause of action should not be dismissed pursuant to section 2-615 unless it is clearly apparent that no set of facts can be proven that would entitle the plaintiff to recover. *Marshall*, 222 Ill. 2d at 429, 856 N.E.2d at 429. Although a complaint does not need to contain evidence, it cannot rely on mere conclusions and it must contain facts sufficient to bring a claim within a legally recognized cause of action. *Redelmann v. Claire-Sprayway, Inc.*, 375 Ill. App. 3d 912, 921, 874 N.E.2d 230, 239 (2007).

¶ 24    The condominium association bases its argument primarily on *Minton,* 116 Ill. App. 3d 852, 452 N.E.2d 835, in which an Illinois court extended the implied warranty of habitability to a painting subcontractor. The condominium association contends that the work of the general contractors (builders) and subcontractors whom Illinois has already subjected to the implied warranty is similar to the work of architects. The condominium association emphasizes that fault in the efforts of either a contractor or an architect may create latent defects in a completed building and that the public policy underlying the implied warranty of habitability of construction work is to protect new homeowners from latent defects by holding the responsible party liable. The condominium association also contends that *Paukovitz* is no longer good law, in light of cases such as *Tassan, Von Holdt,* and *Minton,* which impose the implied warranty on parties other than builder-sellers, and that there is no justification for immunizing architects from the reach of *Minton.*

¶ 25    This reasoning, however, oversimplifies *Minton*, misstates the status of *Paukovitz*, and glosses over the distinctions between the tasks that are undertaken by architects and contractors.

¶ 26    In *Minton*, the implied warranty of habitability was extended to a painting subcontractor which caused the alleged latent defect of peeling paint and where the buyers had no recourse against the insolvent builder-seller. *Minton*, 116 Ill. App. 3d 852, 452 N.E.2d 835. Paint on the windows and eaves had begun to peel within 90 days of the buyer taking possession. *Minton*, 116 Ill. App. 3d at 853, 452 N.E.2d at 836. Prior to the builder-seller's dissolution, the buyers asked the builder-seller to correct the problem, but no repairs were attempted. *Minton*, 116 Ill. App. 3d at 854, 452 N.E.2d at 837. Because the builder-seller was insolvent, the buyers filed a breach of implied warranty claim against the painting subcontractor, which was a firm that the builder-seller had chosen and supervised. *Minton*, 116 Ill. App. 3d at 853-54, 452 N.E.2d at 835-36. The

trial court dismissed the claim, but the appellate court found that the implied warranty of habitability should be extended to the subcontractor where the buyers had suffered a loss due to the latent defect in their new home and where the buyers had no recourse against the builder-seller. *Minton*, 116 Ill. App. 3d at 855, 452 N.E.2d at 837. The condominium association argues that this case supports imposing an implied warranty of habitability claim against Hirsch.

¶ 27    In our opinion, however, *Minton* is properly limited to subcontractors such as the painting firm in *Minton* that have helped with the physical construction or the construction-sale of the property. The court emphasized that the implied warranty of habitability of construction arises between the builder-seller and the buyer because of their "unusual dependent relationship." *Minton*, 116 Ill. App. 3d at 854, 452 N.E.2d at 836. Property buyers such as the plaintiffs in *Minton* "depend upon [the builder-seller's] ability to construct and sell a home of sound structure and his ability to hire subcontractors capable of building a home of sound structure." *Minton*, 116 Ill. App. 3d at 854, 452 N.E.2d at 837. The role that the Hirsch architectural firm had in erecting the subject condominiums did not create a dependent relationship with the buyers like the one that existed in *Minton.* The fact that the builders of the subject condominium complex are now alleged to be insolvent does not justify expanding *Minton*'s holding to an entirely different category of defendant. There is no allegation that this architect took part in the construction or the construction-sale of real property and therefore, we find that this architect should not be subject to the implied warranty of habitability of construction. Furthermore, *Paukovitz* is still good law. That case indicates the implied warranty at issue concerns the quality of construction work and shifts the expense of repairing latent defects from the unsophisticated home buyer to those who, in some way, "contribute to the actual construction of [the] home." *Paukovitz*, 271 Ill.

App. 3d at 1039, 649 N.E.2d at 475. Every case cited by the condominium association maintains that core principle.

¶ 28     The condominium association is mistaken when it contends architects and builders are similar because their work results in a tangible structure and that both architects and builders are already subject to the implied obligation to perform their tasks in a "workmanlike" manner.

¶ 29     Architects are professionals who design and create plans and specifications for the construction of buildings or structures. Sam A. Mackie, *Architect's Negligence*, 33 Am. Jur. Proof of Facts 3d 57, § 5 (1995) (generally defining the work of an architect). *Carvalho v. Toll Brothers & Developers*, 651 A.2d 492 (N.J. Super. Ct. App. Div. 1995) (referring to architects and engineers who prepare plans and specification for construction as "professionals"). In contrast, home builders or contractors are responsible for the physical implementation of the architect's plan. They are project managers and possibly tradesmen who are responsible for the overall coordination of a construction project and for the provision of all material, labor and equipment necessary for the construction of a structure. Description of "General Contractor," Wikipedia, https://en.wikipedia.org/wiki/General_contractor (last visited June 16, 2015). See also 770 ILCS 60/1 (West 2012) (section of mechanics lien statute defining contractor as a person who manages the construction of a residence or business and who improves land by furnishing labor, services, material, fixtures, or machinery); *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746, ¶ 3, 995 N.E.2d 381 ("In its capacity as construction manager, Bovis was responsible for coordinating day-to-day activities on the project, including the work of all contractors and subcontractors."). Therefore, it is not the architect's work–it is the builder's work–which creates the tangible structure.

¶ 30    Also, architects are not workmen and they are not obligated to perform their professional services in a "workmanlike manner." A workman is a person "who labors" or is "employed in manual labor, skilled or unskilled." Black's Law Dictionary 1780 (4th ed. 1957). The term "workmen" does not include professional persons. *In re Paradise Catering Corp.*, 36 F. Supp. 974, 975 (S.D.N.Y. 1941) (the common and popular meaning of "workmen" does not include professionals); *Carvalho*, 651 A.2d 492 (referring to an architect-engineer as a "professional" and to a trench laborer as a "workman"). To perform in a "good and workmanlike" manner is to perform "quality craftsmanship" or to construct or perform in a skillful way or method. Black's Law Dictionary 761 (9th ed. 2009). Thus, while builders, contractors, and craftsmen in the construction trades should be held to the "workmanlike" standard, architects should not. We maintain this conclusion despite the condominium association's citation to a case stating that an architectural firm hired to design a junior high school in Schaumburg, Illinois, was obligated "to perform its work in a reasonably workmanlike manner." *Board of Education of Community Consolidated School District No. 54 v. Del Bianco & Associates, Inc.*, 57 Ill. App. 3d 302, 308, 372 N.E.2d 953, 958 (1978). The court was generally stating the extent of the architect's duties to its client. The architect's contract with the school board, which was a form contract distributed by The American Institute of Architects, did not include the term "workmanlike." *Del Bianco*, 57 Ill. App. 3d at 307-08, 372 N.E.2d at 957. Instead, it was the court that used this term to describe an implied standard of care for the architect's efforts as the court evaluated whether the architect had in fact breached its contract with the school board. *Del Bianco*, 57 Ill. App. 3d at 308, 372 N.E.2d at 957. The court's casual use or misuse of the term is not a reason to conclude that an entity which designed but did not construct the condominiums at issue should be subject to the implied warranty of habitability of construction.

¶ 31    Architects are not like the builders, the builder-sellers, or the developer-seller to whom the implied warranty of habitability of construction has been applied and it would be a considerable extension of the law for this court to recognize the claim at issue on appeal. Having reviewed the facts of this case and the legal principles that govern it, we are not persuaded that the architectural firm which took no part in constructing or selling the condominium complex in Wheeling should be subject to the implied warranty of habitability of construction. We decline to recognize the condominium association's "*Minton* claim" against the Hirsch architectural firm. We conclude that the condominium association did not factually state a viable cause of action against Hirsch in count III of its complaint and we affirm the trial court's ruling in Hirsch's favor.

¶ 32    We next address the trial court's dismissal of implied warranty of habitability claims that were filed against the other appellees: the developer (count II), the original and successor general contractors, the masonry subcontractor, and the carpentry subcontractor (count III). The court granted the dismissal for several reasons, including that the record demonstrated that each purchase agreement executed for the condominium units conspicuously disclaimed implied warranties on behalf of the developer-seller and its agents. The condominium association argues the ruling was in error because the disclaimer language in the purchase agreement was not called to the buyers' attention or worded properly and the seller did not show the court each and every purchase agreement.

¶ 33    A section 2-619 motion to dismiss admits the legal sufficiency of the plaintiff's claim but asserts certain defects or defenses outside the pleading that defeat the claim. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31, 976 N.E.2d 318. Specifically, section 2-619(a)(9) permits involuntary dismissal where the claim is barred by "other affirmative

matter." 735 ILCS 5/2-619(a)(9) (West 2012). We review a dismissal pursuant to section 2-619 *de novo*. *Patrick Engineering*, 2012 IL 113148, ¶ 31, 976 N.E.2d 318.

¶ 34     Our supreme court has indicated that even though the implied warranty of habitability came into being as a matter of public policy, buyers may waive that protection. *Petersen*, 76 Ill. 2d at 43, 389 N.E.2d at 1159. However, a builder-seller's attempt to disclaim the implied warranty will be strictly construed against that party. *Petersen*, 76 Ill. 2d at 43, 389 N.E.2d at 1159.

¶ 35     A waiver is an intentional relinquishment of a known right and cannot occur through mistake or misapprehension of fact. *Breckenridge v. Cambridge Homes, Inc.*, 246 Ill. App. 3d 810, 817, 616 N.E.2d 615, 619 (1993). An effective waiver in this context is one that is a conspicuous part of the parties' agreement, refers to the warranty of habitability by name, and discloses the consequences of its inclusion. *Petersen*, 76 Ill. 2d at 43, 389 N.E.2d at 1159 (adopting the warranty of habitability of construction work and stating in *dicta* that the warranty could be disclaimed if certain criteria were met); *Breckenridge*, 246 Ill. App. 3d at 817, 616 N.E.2d at 619 (applying the three criteria suggested by *Petersen*); *Board of Managers of the Village Centre Condominium Ass'n v. Wilmette Partners*, 198 Ill. 2d 132, 138, 760 N.E.2d 976, 980 (2001) (adding the element that an effective waiver is one that expressly disclaims the warranty of habitability and that it is ineffective to substitute terms from the Uniform Commercial Code such as "fitness for a particular purpose"). Our supreme court has declined to adopt or recommend a model disclaimer and indicated that each case is fact specific. *Village Centre Condominium Ass'n*, 198 Ill. 2d at 141, 760 N.E.2d at 981.

¶ 36     A court may find that the language of a contract is so clear and so conspicuous that no other reasonable conclusion could be reached but that the buyer both read and understood the

language and therefore as a matter of law effectively waived the implied warranty. *Country Squire Homeowners Ass'n v. Crest Hill Development Corp.*, 150 Ill. App. 3d 30, 33, 501 N.E.2d 794, 796 (1986). A buyer who has had an opportunity to read a contract before signing it, but signs it before reading it, cannot later plead a lack of understanding. *Breckenridge*, 246 Ill. App. 3d at 819, 616 N.E.2d at 621. The failure to read a document before signing it is not an excuse for avoiding its enforcement. *Breckenridge*, 246 Ill. App. 3d at 819, 616 N.E.2d at 620.

¶ 37     The Condominium Purchase Agreement at issue here consists of 10 pages of typewritten text and 6 pages of attached exhibits. There are 28 paragraphs in the agreement. The warranty language appears in paragraph 8, as follows:

"8. Warranties. At Closing, Seller shall deliver to Purchaser, and Purchaser shall acknowledge receipt of, a Certificate of Warranty with respect to the Purchased Unit in the form of Exhibit C attached hereto and made a part hereof. EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER HEREBY EXCLUDES ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED (INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, HABITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE), WARRANTIES FOR CONSUMER PRODUCTS UNDER MAGNUSON-MOSS WARRANTY ACT WITH RESPECT TO THE PURCHASED UNIT AND COMMON ELEMENTS. BY PURCHASER'S EXECUTION OF THIS PURCHASE AGREEMENT, PURCHASER ACKNOWLEDGES THAT IT HAS READ AND UNDERSTOOD THE CERTIFICATES [*sic*] OF WARRANTY ATTACHED AS EXHIBIT [C] HERETO AND THAT THERE ARE NO WARRANTIES OF ANY KIND MADE HEREIN WITH RESPECT TO DEFECTS IN CONSTRUCTION OF THE PURCHASED UNIT AND

COMMON ELEMENTS EXCEPT FOR WARRANTIES MADE IN SAID

CERTIFICATES OF WARRANTY. ANY LIABILTIES AND OBLIGATIONS OF

SELLER (AND ITS OWNERS, OFFICERS, AGENTS, AND OTHER

REPRESENTATIVES) UNDER OR WITH RESPECT TO WARRANTIES

HEREUNDER OF THE TRANSACTION HEREIN CONTEMPLATED, SHALL NOT

EXCEED THE COST OF REPLACEMENT OF THE SUBJECT ITEM, AND SHALL

IN NO EVENT GIVE RISE TO ANY LIABLITY OR OBLIGATION FOR ANY

INCIDENTAL, CONSEQUENTIAL OR SIMILAR DAMAGES, PURCHASER

ACKNOWLEDGES THAT HE IS (THEY ARE) BUYING THE PURCHASED UNIT,

RIGHTS APPURTENANT THERETO IN OTHER PROPERTY, AND PERSONAL

PROPERTY TO BE CONVEYED, ALL WITHOUT WARRANTY OR

REPRESENTATION OF ANY KIND, EXPRESS OR IMPLIED, BY SELLER OR

ANY OFFICER, EMPLOYEE, AGENT, BROKER, OR OTHER REPRESENTATIVE

OF SELLER, OTHER THAN THAT SET FORTH ABOVE. Purchaser waives all rights

against Seller, under any legal theory and whenever arising, based in whole or part on

conditions not warranted, or for damages hereby excluded. This paragraph may not be

modified by any method (including, without limitation, oral representation of course of

conduct [*sic*] other than a written instrument executed on behalf of Seller by its officers

or attorneys, and Purchaser understands that no other party is or will be authorized so the

[(sic)] execute such an instrument."

¶ 38    The attached Certificate of Limited Warranty states that a limited warranty will cover all

latent defects attributable to faulty workmanship or defective material that were not apparent

during the seller's inspection but reported in writing within one year of substantial completion of

the seller's work. It then states, in a separate paragraph: "THIS LIMITED WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES OF SELLER, EXPRESS OR IMPLIED (INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY, HABITABILITY OR FITNESS FOR A PARTICULAR PURPOSE), AND INURES ONLY TO THE BENEFIT OF THE PURCHASER WHO HAS SIGNED AND APPROVED THIS LIMITED WARRANTY." This sentence was made conspicuous by its placement on the first page of the certificate of limited warranty and by being one of only three provisions in all-capitalized font. The entire certificate is slightly more than two pages in length. The third page contains only the execution date, the buyer's signature, and the following statement: "The undersigned Purchaser approves and accepts the above Limited Warranty, including the terms, conditions and exclusions thereto, and agrees that this Certificate of Limited Warranty is in lieu of all other warranties of Seller, including without limitation those implied at law, with regard to the Purchased Unit."

¶ 39    An affidavit executed by Vivian J. Smith indicates she holds a management position with Park Point at Wheeling, LLC, which was the developer-seller of the condominium units, and that she is knowledgeable about the 96 condominium sales that occurred between 2001 and 2004. Ms. Smith swore that each buyer executed the Condominium Purchase Agreement and Certificate of Limited Warranty and that the developer-seller did not allow any buyer to modify the warranty disclaimer terms.

¶ 40    Reviewing the quoted provision within the context of the entire purchase agreement leads to the conclusion that the disclaimer was conspicuous because it was all capitalized and there was only one other section in the contract that was similarly capitalized (the part of paragraph 4 in which the seller disclaimed any express or implied warranties for personal property in the

unit). The all-capitalized text within the context of the concise contract catches the reader's eye. The all-capitalized provision within the contract was sufficient as a matter of law to bring the waiver to the buyer's attention. Furthermore, the provision refers to the warranty of habitability by name, fully discloses the consequences of its inclusion in the contract and it was, in fact, a part of the agreement executed by the parties. Therefore, the provision meets the *Petersen* and *Breckenridge* criteria of an effective disclaimer. In addition, each buyer reviewed and executed the Certificate of Limited Warranty again confirming the seller's disclaimer of liability for latent defects. The Certificate of Limited Warranty would not have been enough on its own to disclaim the implied warranty of habitability, but it did strengthen some of the disclaimer terms in the main contract.

¶ 41    The condominium board misapprehends the governing standards when it argues (1) it was the developer-seller's policy and practice not to specifically point out the disclaimer to buyers before they executed the contract and (2) that the affidavit of Robert Yedinak, who is a unit owner and the president of the condominium association, indicates, "At no time did anyone on behalf of seller inform me [of the disclaimer in the purchase agreement]." A seller is not required to specifically point out a disclaimer in a written contract. In Illinois, a disclaimer of the warranty of habitability is effective if it is a conspicuous part of the contract, refers to the warranty by name, and uses plain language that fully discloses the consequences of its inclusion. *Petersen*, 76 Ill. 2d at 43, 389 N.E.2d at 1159; *Breckenridge*, 246 Ill. App. 3d at 821, 616 N.E.2d at 622; *Country Squire Homeowners Ass'n*, 150 Ill. App. 3d at 32, 501 N.E.2d at 796. Furthermore, a seller is not required to use a particular method of bringing a disclaimer to the attention of the buyer, such as having the buyer initial the provision.

¶ 42 The condominium association misconstrues the significance of *Colsant*, in which the builder-seller argued in part that language in its express warranty also curtailed the scope of the implied warranty. *Colsant v. Goldschmidt*, 97 Ill. App. 3d 53, 55, 421 N.E.2d 1073, 1075 (1981). The builder-seller was relying on a sentence which stated, " 'Builder does not assume responsibility for any secondary or consequential damages caused by any defects.' " *Colsant*, 97 Ill. App. 3d at 54, 421 N.E.2d at 1075. The court rejected the seller's arguments, because its disclaimer was a single sentence, in regular font, buried in the midst of 65 paragraphs, it did not explain the purported consequences of accepting the terms, it was worded broadly, and it did not refer to any particular warranty. *Colsant*, 97 Ill. App. 3d at 57, 421 N.E.2d at 1077. In other words, it failed because it did not meet any of the established criteria. We do not read *Colsant* to mean that a builder-seller is required to call the buyer's attention to its disclaimer language.

¶ 43 The condominium association next cites *Chestnut Hills* for the proposition that unless a buyer separately initials a disclaimer, the disclaimer is not enforceable as a matter of law. *Board of Managers of Chestnut Hills Condominium Ass'n v. Pasquinelli, Inc.*, 354 Ill. App. 3d 749, 822 N.E.2d 12 (2004). This, however, is a misinterpretation of the court's holding regarding a disclaimer that did not meet all of the established criteria, in that it failed to set out the consequences of waiving the implied warranty of habitability. *Chestnut Hills*, 354 Ill. App. 3d at 758, 822 N.E.2d at 19; *Petersen*, 76 Ill. 2d at 43, 389 N.E.2d at 1159 (requiring in part that a purported waiver of the implied warranty of habitability disclose the consequences of the waiver). The court pointed out this defect and also contrasted the circumstances with what had occurred in another case, *Breckenridge*, 246 Ill. App. 3d 810, 616 N.E.2d 615, in which the buyers admitted they read their warranty disclaimer and understood what they were doing when they wrote their initials next to it. The court was not attempting to enhance the *Petersen* criteria.

¶ 44    Despite the appellant's argument, we find that that the seller of the condominiums at issue was not required to verbally call the warranty disclaimer to each buyer's attention or obtain each buyer's initials next to it. We also find that the disclaimer, set out above, does in fact meet the *Petersen* and *Breckenridge* criteria of an effective disclaimer, in part because it was brought to each buyer's attention by being conspicuous within the parties' contract.

¶ 45    The condominium association also argues the trial court should not have allowed the appellees to prevail on their affirmative defense of waiver without requiring them to tender each and every executed purchase agreement and warranty certificate. The condominium association contends each contract is important because the buyers own undivided interests in the common elements, and, thus, even a single buyer could recover the costs of repairing material defects in all the common elements. *Tassan*, 88 Ill. App. 3d at 594-95, 410 N.E.2d at 913. The record, however, includes the affidavit of Ms. Smith, who swore that the form contract attached to the condominium association's complaint was signed by each purchaser. Ms. Smith made a similar statement about the warranty certificate exemplar that was tendered with the complaint. She also specified that no revisions were permitted by any party to the warranty provision. The condominium association did not counter Ms. Smith's affidavit with any contrary facts. When a supporting affidavit has not been refuted by a counter-affidavit or other appropriate means, the facts in that supporting affidavit are deemed admitted. *Zedella v. Gibson*, 165 Ill. 2d 181, 185, 650 N.E.2d 1000, 1002 (1995). Therefore, the record shows that the waiver applies equally to the unit owners and precludes the possibility that there is a different version of the documents which did not include the waiver. Moreover, we granted the condominium association's motion to cite *Fattah* as additional authority in support of its appeal, but that decision does not change our analysis. *Fattah v. Bim*, 2015 IL App (1st) 140171, 31 N.E.3d 922. In *Fattah*, we held that a

subsequent buyer could maintain a claim against a developer for breach of the implied warranty, even though the original buyer had waived the claim, because the subsequent buyer was unaware of the waiver and had not knowingly assented to the same terms. *Fattah*, 2015 IL App (1st) 140171, 31 N.E.3d 922. The condominium association contends this is an indication the defendants did not prevail on their affirmative defense. We disagree, as there is no subsequent buyer. The plaintiff is an association of all the current owners of the subject condominium units, and if this group included a subsequent buyer who did not knowingly assent to the disclaimer at issue, then the association should have made this fact and argument known during the trial court proceedings. Ms. Smith's affidavit stands unopposed. *Zedellan*, 165 Ill. 2d at 185, 650 N.E.2d at 1002.

¶ 46 Accordingly, we affirm the trial court's dismissal of the developer-seller, PPW, from these proceedings.

¶ 47 The condominium board next argues that for public policy reasons, *Pratt II* dictates that the disclaimer should be applied only to the developer-seller that executed it and should not be extended to other parties such as the project's general contractor or subcontractors. *Pratt II,* 2012 IL App (1st) 111474, 974 N.E.2d 279. This argument is unpersuasive. The decision the condominium board relies on, *Pratt II*, was based on contract language which clearly limited the disclaimer to the seller. The court did not, as the condominium association claims, reach that conclusion in order to protect the buyers and implement the public policy underlying the implied warranty of habitability of construction. In fact, the court initially noted that " 'a knowing disclaimer of the implied warranty of habitability is *not* against the public policy of this state.' " (Emphasis added.) *Pratt II*, 2012 IL App (1st) 111474, ¶ 28, 974 N.E.2d 279 (quoting *Petersen*, 76 Ill. 2d at 43, 389 N.E.2d at 1159). The court then followed the " 'basic rules of contract

interpretation,' " by applying the terms of the parties' "clear and unambiguous" agreement. *Pratt II*, 2012 IL App (1st) 111474, ¶ 31, 974 N.E.2d 279 (quoting *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (2011)). The court found that the disclaimer there applied to the seller and not the contractors and subcontractors (*Pratt II*, 2012 IL App (1st) 111474, ¶ 32, 974 N.E.2d 279), because the agreement said: " 'THE SELLER HEREBY DISCLAIMS AND THE PURCHASER HEREBY WAIVES THE IMPLIED WARRANTY OF HABITABILITY DESCRIBED IN PARAGRAPH 10(B) ABOVE' " (emphases omitted) (*Pratt II*, 2012 IL App (1st) 111474, ¶ 30, 974 N.E.2d 279).

¶ 48     Thus, the question becomes whether the wording of the purchase agreement for the condominium units at Park Point at Wheeling encompassed all the defendants when it disclaimed the implied warranty on behalf of the "SELLER (AND ITS OWNERS, OFFICERS, AGENTS, AND OTHER REPRESENTATIVES)." The contract defines seller as "Park Point at Wheeling, L.L.C.," but does not define officers, agents or other representatives. The trial court concluded that Smith, the general contractor, was an agent or representative of the developer-seller, based on the condominium association's allegations in paragraphs 5 and 17 of count III (the "*Minton* claim") that Smith "provided development services" and "held itself out to prospective buyers as a knowledgeable developer and contractor regarding the sale of Condominium."

¶ 49     However, these are not allegations that Smith was an agent or representative of the developer-seller. An agency is a fiduciary relationship in which the principal has the right to control the agent's conduct and the agent has the power to act on the principal's behalf. *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 326 Ill. App. 3d 126, 134, 759 N.E.2d 174, 181 (2001). Generally speaking, the terms "agent" and "representative" may be used interchangeably. The commonly understood meaning of "agent" is a person "who is authorized to act for or in the

place of another; a representative." Black's Law Dictionary 72 (9th ed. 2009). A "representative" is a person "who stands for or acts on behalf of another." Black's Law Dictionary 1416 (9th ed. 2009). See also *Sunset Milling & Grain Co. v. Anderson*, 249 P.2d 24, 27 (1952) (stating that the appellant's "attempted distinction [between the terms representative and agent] is without merit because, for all general purposes, the designations are synonymous" and "may be used interchangeably"); *Texas Power & Light Co. v. Adamson*, 203 S.W.2d 275, 276 (Tex. Civ. App. 1947) (indicating that the terms agency and representative are interchangeable and indicate "the use of at least some discretionary authority; the taking the place of the principal and acting in the furtherance of his business"). The allegations that Smith "provided development services" and "held itself out as a knowledgeable developer and contractor" are not allegations that Smith was authorized to act for or on behalf of the developer-seller PPW. Therefore, Smith does not come within the terms of the disclaimer and is not entitled to its protection. Accordingly, the trial court's dismissal of count III as to Smith on the basis of the warranty disclaimer was in error and is vacated. We also find that it was an abuse of discretion to deny the motion to reconsider the ruling as to Smith, and we reverse that ruling. *General Motors Acceptance Corp. v. Stoval*, 374 Ill. App. 3d 1064, 1078, 872 N.E.2d 91, 103 (2007) (indicating the purpose of a motion to reconsider is to bring the court's attention to a change in the law, ask the court to revaluate its application of existing law, or present newly discovered evidence that was not available when the original hearing occurred; and that a trial court's ruling on a motion to reconsider will not be overturned absent an abuse of discretion).

¶ 50     We, however, reach the opposite conclusion with respect to the claims against the masonry and carpentry subcontractors, Midwest and G.W. Thiel, even though those parties do not come within the scope of the warranty disclaimer by being agents or representatives of the

developer-seller. The claims against the subcontractors were properly dismissed because the condominium association failed to plead facts indicating the general contractor, Smith, is insolvent.

¶ 51    The *Minton* court held "where the innocent purchaser *has no recourse* to the builder – vendor and has sustained loss due to the faulty and latent defect in their new home caused by the subcontractor, the warranty of habitability applies to such subcontractor." (Emphasis added.) *Minton*, 116 Ill. App. 3d at 855, 452 N.E.2d at 837. Subsequently, in *Washington Courte*, a condominium association sued the developer-general contractor-seller and the numerous subcontractors regarding problems with the units. *Washington Courte Condominium Ass'n-Four v. Washington-Golf Corp.*, 150 Ill. App. 3d 681, 682-83, 501 N.E.2d 1290, 1291 (1986). Citing *Minton*, the court rejected the claim against the subcontractors, because "the allegation of insolvency is legally unsubstantiated and is a matter *de hors* the record." *Washington Courte*, 150 Ill. App. 3d at 689, 501 N.E.2d at 1296. Following the reasoning in *Minton* and *Washington Courte*, the court ruled in *Dearlove Cove* that when a condominium association sued a general contractor for breach of the implied warranty of habitability and the contractor subsequently became insolvent, the insolvency triggered an action against the subcontractor for breach of the implied warranty of habitability. *Dearlove Cove Condominiums v. Kin Construction Co.*, 180 Ill. App. 3d 437, 441, 535 N.E.2d 1141, 1144 (1989). The statute of limitations to bring a claim against the subcontractor started when the condominium association knew or reasonably should have known about the insolvency. *Dearlove Cove*, 180 Ill. App. 3d at 441, 535 N.E.2d at 1144 (1989).

¶ 52    Citing to language in these three decisions, a subcontractor in *Pratt III* argued there was some uncertainty as to whether the threshold for suing a subcontractor was when there was " 'no

recourse' " against the contractor or when the contractor lacked " 'viability' " or " 'solvency.' "
*1324 W. Pratt Condominium Ass'n v. Platt Construction Group, Inc.*, 2013 IL App (1st) 130744,
¶ 19, 997 N.E.2d 246 (*Pratt III*). However, the court strongly disagreed and held, "The law in
Illinois is clear. An innocent purchaser may proceed on a claim for the breach of the implied
warranty of habitability against a subcontractor where the builder-vendor is insolvent." *Pratt III*,
2013 IL App (1st) 130744, ¶ 20, 997 N.E.2d 246.

¶ 53    Also, "Insolvency simply means that a party's liabilities exceed the value of its assets, and
that it has stopped paying debts in the ordinary course of business." *Pratt III*, 2013 IL App (1st)
130744, ¶ 25, 997 N.E.2d 246; see also 740 ILCS 160/3 (West 2012) ("(a) A debtor is insolvent
if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation. (b) A
debtor who is generally not paying his debts as they become due is presumed to be insolvent.");
Black's Law Dictionary 867 (9th ed. 2009) (defining "insolvent" as "having liabilities that exceed
the value of assets; having stopped paying debts in the ordinary course of business or being
unable to pay them as they fall due").

¶ 54    The court also clarified that if the plaintiff wishes to sue the subcontractor for breach of
the implied warranty, the plaintiff must prove it needs to do so:

> "It is the burden of the purchaser to establish that the general contractor is insolvent
> before it can proceed against the subcontractor on such a claim. Once the purchaser
> becomes aware that the general contractor is insolvent, it must file an amended
> complaint, alleging the insolvency and seeking to proceed against the subcontractor."
> *Pratt III*, 2013 IL App (1st) 130744, ¶ 25, 997 N.E.2d 246.

¶ 55    In the instant case, the condominium association's claims against the masonry and
carpentry subcontractors were dismissed because it did not meet this threshold. It was allowed to

amend its allegations (count III) in order to plead the insolvency of the Smith entities, but its amended allegations were still insufficient:

> "On information and belief, SMITH no longer does business, is insolvent, and the Board has no recourse against SMITH for the Board's damages in the amount of repair costs in excess of $4,000,000. On information and belief SMITH CONSTRUCTION has no assets or alternatively insufficient assets, in that the Board has no recourse against SMITH CONSTRUCTION for the Board's damages in the amount of repair costs in excess of $4,000,000."

¶ 56    These allegations are deficient. The allegation that the first Smith entity "is insolvent" and the allegation that the second Smith entity "has no assets or alternatively insufficient assets [to satisfy a $4 million damage award]" are conclusions without underlying facts tending to show that the Smith entities are insolvent. Underlying facts might have been, for instance, that the Smith entities have filed for bankruptcy. The condominium association's conclusions do not suggest that each general contractor's "liabilities exceed the value of its assets, and that it has stopped paying debts in the ordinary course of business." *Pratt III*, 2013 IL App (1st) 130744, ¶ 25, 997 N.E.2d 246. The condominium association creates its own criteria when it complains that the Smiths do not have enough assets to satisfy the estimated $4 million damages. Furthermore, tacking the phase "on information and belief" at the front of the conclusory allegations did not improve them. Even an allegation made on information and belief must be supported by specific facts. *Patrick Engineering*, 2012 IL 113148, ¶ 40, 976 N.E.2d 318 (indicting that even at the pleading stage, a plaintiff is capable of alleging details of the efforts it took to learn the necessary facts). Furthermore, as subcontractor G.W. Thiel argues, the allegation that the first Smith entity has "no assets" is belied by that entity's active participation

in this lawsuit at the trial and appellate stages. Our records indicate that in 2013 and 2014, the Smith entities filed a cross appeal, an opening brief, and a response brief to the condominium association's brief, and that after settlement talks with the condominium association ensued, the parties asked us to stay the appeal. The most recent filing from the Smith entities was in mid 2015 when some of the defendants and the condominium association filed a joint status report informing us that the settlement negotiations had succeeded in resolving the cross appeal and many issues in the original appeal. When we disregard the conclusory statements, there are insufficient facts alleged to state a cause of action against Midwest or G.W. Thiel. For these reasons, we affirm the dismissal of the claims against subcontractors Midwest and G.W. Thiel. *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 426, 430 N.E.2d 976, 985 (1981) (if, after deleting conclusions, there are not sufficient allegations of fact to state a cause of action, then a motion to dismiss the claim must be granted).

¶ 57      In summary, we affirm all the rulings on appeal with the exception of the rulings regarding Smith: the dismissal of count II as to developer PPW is affirmed; the dismissal of count III as to architect Hirsch is affirmed; the dismissal of count III and the denial of the motion to reconsider the order as to general contractors Smith are reversed; and the dismissal of count III as to subcontractors Midwest and G.W. Thiel is affirmed. This cause is remanded for further proceedings consistent with this opinion.

¶ 58      Affirmed in part, reversed in part, and remanded for further proceedings.